Mollie Stark v. G. R. Berger; J. M. Kurn and John G. Lonsdale, Trustees of the St. Louis-San Francisco Railway Company, Appellants.—125 S. W. (2d) 870.

Court en Banc, March 7, 1939.

*Joseph W. Jamison, A. P. Stewart* and *A. E. L. Gardner* for appellants.

*Cave & Hulen, Forrest Hemker* and *Taylor, Mayer & Shifrin* for respondent.

WESTHUES, C.—This is an appeal by appellants, defendants below, from a judgment against them in plaintiff's favor in the sum of $10,000 for the death of plaintiff's husband. The case comes to the writer on reassignment.

Respondent is the widow of Sidney Stark, who lost his life at a grade crossing in the village of Shrewsbury, St. Louis County, Missouri, in a collision between a Frisco passenger train and a truck driven by Stark. Appellants are: G. R. Berger, the engineer of the train; J. M. Kurn and John Lonsdale, trustees of the St. Louis-San Francisco Ry. Co. The case was submitted to the jury by instructions under the humanitarian doctrine. Appellants have preserved for our review the sufficiency of the evidence to support the verdict. The question for decision is a close one, but after a full consideration of all the facts and circumstances in evidence we have reached the conclusion that appellants' contention must be sustained.

Deceased was, on the day of the collision and for a number of days prior thereto, driving a truck engaged in hauling rock for the C. W. A. It was necessary, to reach the point where the rock was to be delivered, to cross the main line of the Frisco at Gratiot Avenue in Shrewsbury. This avenue is a much traveled concrete roadway running in a northerly and southerly direction. The railroad tracks run in an easterly and westerly direction. The passenger train here concerned was number seven, known as the Blue Bonnet. It was traveling west at a speed of about fifty miles per hour. The truck driven by deceased was loaded with rock and was going south at a speed of about fourteen miles per hour. There was an upgrade for about six hundred feet on Gratiot Avenue until within about twenty-five feet of the track where the grade became level, and so continued, on and over the crossing. A train approaching this avenue or crossing could be seen from the roadway for a distance of about eight hundred feet at any point within five hundred feet to the north of the track, and, vice versa, cars could be seen on the roadway from the railroad tracks from the points indicated. The collision occurred at about two-thirty p. m. on February 22, 1934. The evidence showed that it was a clear day and the roadway and railroad tracks were dry. Immediately before the collision, and as the train was approaching the crossing, a signal or warning bell located at the crossing and the bell on the engine were

ringing. A number of plaintiff's witnesses stated that the whistle of the engine was sounded at short intervals as the train approached the crossing. There were a number of trucks engaged in hauling rock. Two of these had stopped at the crossing to let the train pass. Witnesses placed the distance between the point where the first truck stopped and the tracks at twenty-five to forty-five feet and the distance between the first truck and the second at about ten feet. The truck operated by deceased was the third. It did not stop, but passed the two trucks that were standing still and attempted to cross the tracks in front of the on-coming train. The truck failed to clear the track ahead of the train by a small margin. The pilot beam of the engine struck the rear end of the truck resulting in the death of Stark. When the train was brought to a stop the rear end was twenty-five feet to the west of the crossing. It consisted of an engine and nine cars and was about six hundred feet in length.

It is respondent's theory that Berger, the engineer of the train, could have, by the exercise of ordinary care, discovered that deceased did not intend to stop for the train, in time thereafter to have slackened the speed of the train sufficiently for the truck to have cleared the tracks. One witness testified that the truck could have been stopped within a distance of ten feet. Perhaps he could on the upgrade he was ascending, but let us for the purpose of this case assume that it required a distance of twenty feet to stop the truck. The engineer of the train had the right to assume that the deceased would stop before entering in the pathway of the train. The rule was well stated in Elkin v. St. Louis Public Service Co., 335 Mo. 951, 959, 74 S. W. (2d) 600, l. c. 604, as follows:

"Under the facts shown the motorman had a right to assume that plaintiff would stop the truck before driving upon the track. This being true, the motorman was under no duty to slacken the speed of the car or sound a warning of its approach until it was or should have been apparent to him that plaintiff did not intend to stop before going upon the track. Plaintiff testified that the truck was traveling four or five miles per hour and he could have stopped it at any time within a distance of two feet. If the truck could have been stopped within a space of two feet, and if the motorman had a right to presume that plaintiff would stop it before driving upon the track, undoubtedly it could not have been apparent to the motorman that plaintiff did not intend to stop until the truck was so near the track that no juror could say, without entering the field of guess and speculation, that the motorman could have avoided the collision by checking the speed of the street car or by sounding a warning after he saw or should have seen that plaintiff did not intend to stop and let the street car pass."

[See, also, Willhauck v. Chi., R. I. & P. Ry. Co., 332 Mo.

1165, 61 S. W. (2d) 336, l. c. 339 (6).] There was no evidence introduced to show that deceased was oblivious of the oncoming train. Two of his co-truck-drivers had stopped at the crossing, which was in itself a warning that there was danger ahead. Bells were ringing, the whistle of the engine was blowing, and, as per the testimony of the two truck drivers who had stopped, they waived to the deceased to stop for the train. There was sufficient space between the point where the first truck was standing and the railroad tracks for the deceased's truck to have stopped in safety. Under those circumstances the questions are presented as to when the peril arose and at what point should the engineer have realized that the deceased was not going to stop for the train. The engineer was called, by plaintiff, and testified that he saw deceased's truck pass the truck standing nearest the track; that as soon as he realized deceased was not going to stop he set the emergency brake; that the truck was then only a short distance from the crossing. He estimated this distance at about twenty-five feet or less. Curtis Jones, a witness for plaintiff, testified that he too was driving a truck loaded with rock and was following the truck driven by deceased; that he saw the two trucks stop for the crossing, saw the train coming and deceased drive past the standing trucks; that when the train was nearing the crossing he saw fire and sparks under the wheels of the train, which he testified was the result of the brakes being applied. Respondent stated in her brief that the engineer admitted he realized deceased was not going to stop when the truck was about seventy feet from the crossing. But the record does not support that assertion.

Courts take judicial notice of the fact that some time must elapse from the moment the engineer realizes the danger and the time the brakes can be set. In McGowan v. Wells, 324 Mo. 652, 24 S. W. (2d) 633, l. c. 639 (7, 8), this court said:

"Then, also, it is to be remembered an appreciable time was required for the motorman's mind and muscular system to act and for the brakes to be set. We can take judicial notice of that. [Vale v. Noe, 172 Wis. 421, 424, 179 N. W. 572, 573.]"

The train, which was going at fifty miles per hour, covered a distance of about seventy-four feet per second. The truck driven by deceased was traveling about twenty feet per second. These facts were conceded. It is evident, therefore, that deceased did not enter a position of peril until he reached the point where he could not stop his truck before entering in the pathway of the train. The collision occurred within two seconds thereafter. The only legitimate inference to be drawn from the evidence is that the engineer began to set the brakes of the train when it was one hundred and fifty feet or so from the crossing. Plaintiff's witness, Curtis Jones, saw the sparks flying from under the wheels of the

train before it reached the crossing. The fireman, a witness for defendant, testified that he was on the opposite side of the engine and noticed the brakes were beginning to take effect when the engine was about sixty feet from the crossing. The engineer testified that he applied the brakes as soon as he realized deceased did not intend to stop. Respondent, however, relies much on the evidence of Charles Blackman, an engineer by occupation, who testified, as an expert, that a train, such as the Blue Bonnet, could be brought to a stop within about two hundred and fifty feet when traveling at a speed of fifty miles per hour. He testified that he had never had any actual experience in stopping such a train in that distance, but he based his evidence upon a test that was made in the Kansas City yards in stopping a train running at thirty miles per hour. From that test he made the calculation that the speed of a train, going at fifty miles per hour, could be reduced to thirty-two miles per hour within a space of one hundred feet; that in the next fifty feet it could be reduced to twenty-five miles, in the next fifty to nineteen and within the next fifty to a complete stop. This witness further testified that the emergency air-brake with which the Blue Bonnet was equipped would work automatically and instantaneously the instant the valve or lever was pushed into position; that all the brakes on the train would then take effect instantaneously. When the evidence of this witness is carefully analyzed we find that it does not support the conclusion that the brakes of a train take hold the instant the lever of the emergency brake is pushed into position. Note his evidence:

"When an emergency air brake is set, it operates instantaneously and automatically. It is not necessary for the air to travel from the rear of the train to the engine when that emergency brake is set. In setting air brakes in emergency, the air is drawn through the engineer's brake valve and exhausted through an exhaust port, but in making any application there is an emergency valve under each and every one of these triple valves. As the air is drawn from the train in the emergency application line, this emergency valve has an extra opening controlled by a spring, and this acts back there and they begin to set automatically, and it is instantaneous at the same time, in this emergency application."

All these various movements necessary to set the brake in motion, the pushing of the lever and even the passing of the compressed air from one chamber to another, consume at least some time. Soon a second has passed and the train has moved seventy-five feet without any reduction in speed. Respondent also lays much stress upon the evidence given by the defendant Berger at the coroner's inquest. It is claimed that his evidence at the trial was at variance with the evidence at the inquest. At the trial he testified that he realized deceased was not going to stop the truck

*after* deceased has passed the standing truck a short distance; that he then immediately set the emergency brake. At the inquest Berger testified in substance that he did not set the brake until deceased drove on the track; that the engine was then about fifty or sixty feet from the crossing. At the coroner's inquest Berger also testified, in answer to a question asked by respondent's attorney, as follows:

''Q. Where was the engine when you first noticed the slackening of the speed, with reference to the crossing, I mean? A. I noticed a slackening of the speed before we got to the crossing.''

So in analyzing the evidence given by the engineer at the coroner's inquest we find it substantially the same as that given at the trial. That evidence coincides with the evidence given by the truck driver, Curtis Jones, a witness for the plaintiff, and also with the evidence of the fireman, a witness for defendant. This, then, leaves the record free from any evidence that the brakes were not applied until after the truck was upon the crossing. A number of witnesses testified that they did not notice any reduction in the speed of the train before it reached the crossing. Under the circumstances there could have been very little reduction in the speed, and that evidence is not inconsistent with the positive facts as testified to by the witnesses above mentioned. If the brakes of the train began to take effect, as these witnesses testified, when the engine was about fifty or sixty feet from the crossing, then the engineer must have commenced his movements to set the emergency brake when the engine was at least one hundred and fifty feet from the crossing. Deceased could have stopped his truck in safety at any point until the train was one hundred and fifty feet from the point of collision, because at that time the truck must have been about twenty feet north of the track. It is conceded that the truck could have been stopped within a distance of less than twenty feet.

Respondent has cited a number of cases in support of the theory that plaintiff made a submissible case under the humanitarian doctrine. We have examined them and in our opinion the evidence in each case was more substantial than in the case now before us. Note that in Hinds v. Chi., B. & Q. Railway Co., 85 S. W. (2d) 165, there was a failure to warn, when a truck, driven along the highway parallel to the tracks, made a turn to cross the railroad tracks at a point where the roadway turned at a right angle. The same is true in the case of Willhauck v. Chi., R. I. & P. Ry. Co., 332 Mo. 1165, 61 S. W. (2d) 336, where no timely warning was given. Likewise in Homan v. Mo. Pac. Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617, the facts were materially different. There, an engine was pushing cars toward a public highway at a speed of only a few miles per hour. The two lead cars were flat cars and could not be seen from the highway because the railroad tracks lay in a cut. A bus

was approaching the crossing at a rapid gait. If it had not been for the flat cars, which were invisible to the bus driver, and which fact the engineer knew or should have known, the bus would have had ample time .to pass. The engineer of the .train, sitting in his cab, could visualize the whole situation, and therefore the court held a case was made under the humanitarian doctrine. No such facts appear in this case. The record here does not contain any substantial evidence that the engineer did not do all within his power to avert the collision after he saw or under the circumstances should have seen plaintiff entering into a position of danger. Lacking such evidence, neither courts or juries have a right under our existing laws to hold defendants liable. To do so would result in making railroad companies guarantors against collisions at crossings.

The judgment is reversed.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the Court en Banc. All the judges concur, except *Tipton, C. J.,* who dissents.