ANNABELLE CAMP, RESPONDENT, v. J. M. KURN AND JOHN G. LONSDALE, TRUSTEES OF ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, A CORPORATION, APPELLANTS.—142 S. W. (2d) 772.

Springfield Court of Appeals. July 12, 1940.

*J. W. Jamison* and *Mann & Mann* for appellants.

*Ray Bond* and *William M. Vaughan* for respondent.

FULBRIGHT, J.—This is an action by plaintiff to recover the statutory penalty for the death of her husband alleged to have resulted from an accident in which the truck he was driving was hit by one of defendants' railroad trains. The cause was tried before a jury, resulting in a verdict and judgment for plaintiff in the sum of $3500, from which judgment defendants duly appealed.

The petition is in conventional form. The answer is a general denial and a plea of contributory negligence.

Shortly after noon, January 22, 1938, James Otto Camp was fatally injured when a Chevrolet panel body truck, with enclosed cab, which he was driving, was struck by defendants' freight train at a public grade crossing in the town of Iantha, Barton County, some distance west of defendants' depot.

At the first trial the jury failed to agree upon a verdict. On a second trial, October 6, 1939, a verdict and judgment was rendered as above stated. The case was submitted to the jury solely upon negligence under the humanitarian doctrine for failure of the operatives

of the train to slacken its speed or to have sounded "an emergency warning with the whistle" after they saw, or might have seen the deceased "approaching and in a position of imminent peril," and that he was oblivious of the approach of the train.

The deceased, twenty-five years of age, was in the employ of the Interstate Grocer Company at Joplin, and shortly before the collision, had stopped his truck at the McLoud Store near the crossing and leaving there, drove toward and upon the crossing where the collision occurred.

Defendants' tracks run in an east and west direction through the town. The main line track on which the train was approaching from the east is straight for some distance east as well as west of the crossing. The public road or street, that crosses defendants' tracks, is surfaced with gravel and about 75 feet in width. Fifty feet north of the main line track, extending for some distance both east and west of the crossing, there is a side track. Approximately 150 feet north of the main line track and extending westwardly from the north and south road is a street running parallel to the track. On the north side of this street and approximately 200 feet west of the street or road which runs north and south, is McLoud's store where the deceased last stopped. 100 feet farther west and on the same side of the street is the store of plaintiff's witness, A. E. Snyder.

There were no cars on the north switch tracks and the only building between the street and main line tracks was the station which was located farther west than McLoud's store. East of the north and south street and north of the tracks there were no buildings or other obstructions to the view.

By stipulation of the parties the original photographic exhibits, consisting of plaintiff's Exhibits Two and Three, and Defendants' Exhibits B and C, were detached from the Bill of Exceptions and filed with the clerk, to be considered as part of the Appellant's Abstract of the Record. These exhibits demonstrate, as does the testimony of the witnesses, that there was no obstruction to the view, either of the deceased or of the engine men. The freight train consisting of an engine and 49 cars, estimated by the witnesses to be traveling at from 40 to 45 miles per hour, was not scheduled to stop at Iantha. The deceased came out of McLoud's store, turned his truck around and traveled east 200 feet to the intersection of the two streets and then south to the crossing at a uniform speed estimated by witness Snyder at ten miles per hour; by the locomotive engineer, twelve to eighteen miles an hour, and by other witnesses, from ten to fifteen miles per hour. All agreed there was no change in his speed in the last 150 feet.

Charles H. Miller, a mechanic who serviced the truck driven by the deceased, as a witness for plaintiff, testified that the truck was equipped with four-wheel hydraulic brakes, in good condition; that traveling at

10 miles per hour it could have been stopped in 12 to 15 feet; at 15 miles an hour, in 20 to 25 feet; and at 18 miles an hour, in 30 to 35 feet. Witness Snyder testified that he had driven a truck of similar construction over this crossing frequently; that at the speed he estimated the deceased was driving, the truck could have been stopped in five or six feet. He further testified that he was standing in front of his store, 100 feet west of McLoud's store and approximately 300 feet west of the point where the deceased's truck turned to the south; that he watched the deceased and his truck from the time he left McLoud's store until the time of the accident. Among other things, he stated: "I heard the train whistle when I stepped out of the store there; the ordinary crossing whistle; that was the first whistle. Well, I wouldn't say hardly whether that was the only whistle; I was kind of interested watching the truck and train approach and I wouldn't say. It seems to me like they was doing more whistling, but I wouldn't swear to that. I was watching this truck all of the time."

In answer to the question of why he was watching the truck, this witness testified:

"Well, I don't know, I stepped out the door and heard that whistle and seen this fellow get in the truck—I don't know what made me think it, but it just seemed to me like he was going to drive on the track there, and there was a fellow getting oil—I started to get some oil for him—I started to the pump and was watching the train and truck both at the same time." He also testified that when the truck left the store the train was approaching and in deceased's view as he drove east facing the train. Witness heard the crossing whistle and stated the train was putting out a great volume of smoke, "like it was pulling pretty heavy and was making an awful noise; it was making a lot of noise and a lot of smoke was pouring out."

Engineer Stout and Fireman Fletcher, both testifying as witnesses for plaintiff, stated that the bell upon the engine was being continuously rung by an automatic bell ringer; that when a mile from the station the station whistle of one long blast was sounded, and when the train reached the whistling post, a quarter of a mile from the crossing, the regulation crossing whistle, consisting of two longs, a short and a long blast, was sounded. These blasts of the whistle were sounded at intervals so that the last blast of the whistle was still being sounded when the train struck the truck.

The engineer testified that he could see the road clearly for a distance of a quarter of a mile from the crossing; that when he first saw the truck it was somewhere between 50 and 100 feet south of the crossing, and was coming upon the side track; that the train was about 300 feet east of the crossing at the time, traveling between 40 or 45 miles an hour. To the best of his knowledge the truck was traveling anywhere between 12 and 18 miles an hour.

"Q. Now when you were at that point 300 feet east of the crossing and you saw this truck at this siding north, what did you do? A. Well, I was using the whistle—blowing the whistle." He further testified that he applied the brakes when about 200 feet from the crossing.

The fireman testified that the brakes were applied when the engine was 200 feet from the crossing, although admitting that in a former statement he had placed the distance at 175 feet, and that "as we went across the crossing the brakes began to touch the wheels and began to reduce the speed of the train." Both the fireman and the engineer testified that they were familiar as railroad men, with what is known as an emergency or stock signal; that such a signal with the whistle consists of a series of short blasts; that no such signal was given as the train approached the crossing at the time of the accident, the only whistle being the regulation crossing whistle.

T. L. Mallory testified for defendants in substance as follows: That his attention was first attracted to the train by the whistle; at that time the truck was just leaving McLoud's store. "The train continued to whistle from that time up until this truck was hit—that is how come me—I seen this truck coming around the bend, and I heard the train whistle, and I turned to the east window and looked out as this train was coming, and I looked back at the truck again, and I called my wife's attention to it. I just watched that truck come down that road, and I knew if one or the other didn't check their speed that they was just about going to meet on the crossing. The train continued to whistle all of the time. The train was just whistling all of the time is all I would say. The windows to the building were closed. The truck was running about 15 miles an hour, I would say. There was nothing about it that indicated to me that it was not going to stop, only he just still kept on coming."

And on cross examination this witness testified as follows:

"I stood here and by turning my head I could look to the east, or could look to the north. I watched this truck approaching. It never slackened its speed at all as it approached and that concerned me. I called my wife's attention to that situation, and as it got closer, he did not ever slow up. My judgment is that if he had applied his brakes back in here, he could have stopped his truck. He drove right ahead—he never slowed the speed of his truck. I could see the driver of the truck from where I was. I couldn't say which way he was looking. I figured he was looking south, that is the way the truck was going."

Frank Ellis, defendants' general air-brake instructor, testified that there would have been some braking effect within about two seconds after the application of the emergency brake. Other witnesses fixed the time at from four to five seconds.

A number of other witnesses for defendants testified to having heard the whistle when the train was some distance away and at the time the truck left McLoud's store, and that the train continued to whistle until the truck was struck. It was struck at the cab or just back of the driver's seat.

Assignments of error are as follows:

## I.

"The court erred in refusing to give defendants' requested instruction in the nature of a demurrer to the evidence, offered at the close of the evidence on behalf of the plaintiff, and renewed at the close of all the evidence in the case.

## II.

'The court erred in giving plaintiff's Instruction Number 1.

## III.

"The court erred in refusing to give defendants' requested Instruction lettered "D."

## IV.

"The court erred in refusing to give defendants' requested Instruction lettered "E."

## V.

"The court erred in admitting incompetent, irrelevant, immaterial, improper, inadmissible and prejudicial evidence over the objection and exception of defendants."

In passing upon the first assignment it is the duty of the court to accept all evidence favorable to plaintiff as true and to give her the benefit of all reasonable inferences that may be drawn therefrom, and to disregard all unfavorable evidence. [Cento v. Security Building Co., 99 S. W. (2d) 1; Mick v. Thompson Co., 77 S. W. (2d) 470.]

It is also the law in this State that under the humanitarian rule, if a given case in that regard is so plain that average fairminded men cannot reasonably differ about it there is no case to be submitted, but if there is a ground for fair difference of opinion about it, then the question is for the jury. [Lynch v. Baldwin (Mo.), 117 S. W. (2d) 273; Perkins v. Terminal R. Assn., 102 S. W. 915.]

"The constitutive facts of a cause of action under the humanitarian rule, stated in their simplest terms, without any of the refinements, limitations or exceptions which might arise on a particular state of facts, are contained in this formula: '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant, after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without

injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.' '' [Banks v. Morris & Co., 302 Mo. 254, l. c. 273; McCoy v. Home Oil & Gas Co., 60 S. W. (2d) 715.]

"Thus in this State a person may heedlessly and deliberately approach and go across a railroad track with bowed or averted head, looking neither to the right nor the left, and oblivious to his surroundings, when, if he would but look, he would see a coming train and could avoid injury, yet, if the operator of the train sees, or by proper care would see, such person going into or continuing in the danger zone, but oblivious of the impending danger, though negligent in being so, he must use all proper care and means to avoid injuring him. In other words, he must not, if he can avoid it, run down or injure a careless man, though his very carelessness is an integral part of his peril, and he could, if he would, avert such peril. The Missouri rule . . . requires a person operating a dangerous instrumentality to use diligence in avoiding injury to a person whom he sees or could see in or going into peril.'' [Bollinger v. St. Louis-San Francisco Ry. Co., 334 Mo. 720, 67 S. W. (2d) 985, l. c. 990.]

But in the Restatement of the Law of Torts, section 480, quoted with approval in the case of Womack v. Mo. Pac. Ry. Co., 337 Mo. 1160, l. c. 1167, 88 S. W. (2d) 368, it is said: "It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and, therefore, is in peril. The defendant is "entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. However, it is not necessary that the circumstances be such as to convince the defendant that the plaintiff is inattentive and, therefore, in danger. It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. "

Keeping in mind the foregoing observations we shall determine whether there is any substantial evidence to justify the submission of the case to the jury under the humanitarian doctrine. In other words, did plaintiff make a submissible case.

Plaintiff insists that she was entitled to have her case submitted to the jury, first, because of the failure of the enginemen to sound the emergency warning of the whistle; and, second, because of their failure, after the peril arose, to reduce the speed of the train. There is little or no conflict in the evidence. It is undisputed that as the train approached the crossing where the collision is alleged to have occurred, the bell was ringing, the station whistle was sounded, followed by the usual crossing signal, which continued up until the train hit the truck. It is a matter of common knowledge that a crossing whistle is a warning to pedestrians and drivers of vehicles, of an approaching train and that they should remain off of and away from such crossing until the train has passed over and cleared same. The very object and purpose of the crossing whistle is to warn traffic of every kind that a train is about to pass over such crossing and the dangers incident thereto. Such whistle was a sufficient warning and we find no evidence to justify the court in submitting the cause to the jury on that issue.

A determination of the next contention, that is, the failure of the enginemen, after the peril arose, to reduce the speed of the train, must be decisive of this case and requires a careful analysis of the evidence and the law applicable thereto. "Under the humanitarian doctrine the word 'peril' means certain peril, and not the bare possibility that a collision might result." [Branson v. Abernathy Furniture Co., 130 S. W. (2d) 562, l. c. 569.] A "place of imminent peril . . . is not meant a place wherein there is just a mere bare possibility of an injury occurring. It means a place wherein there is certain danger." [Wallace v. St. Joseph Ry. L. H. & P. Co., 77 S. W. (2d) 1011.] In a very recent case decided by this court, we held: "Imminent peril does not mean remote, uncertain, contingent, nor (for the person affected), avoidable danger; it means certain danger, imminently pending and admits of no time for deliberation on the part of the person in peril, between its appearance and the impending calamity." [Swain v. Anders et al., 140 S. W. (2d) 730.] In the case of Clark v. Atchison, T. & S. F. Ry. Co., 319 Mo. 865, 6 S. W. (2d) 954, very similar to the instant case, in discussing this question the court said: "Although a person may be in the pathway of approaching danger, yet, if he is fully cognizant of it and has the present ability to easily avoid it, he is not in a position of imminent peril within the rule. The presumption is that, under such circumstances, he will avoid the danger. Consequently, if the engineer of a train sees an adult person approaching the track, unless there is something in his actions or manner to indicate the contrary, the engineer has the right to assume that such person will step off into a place of safety. This, in substance, has been ruled so often that we deem it unnecessary to cite cases."

In the instant case the evidence, as heretofore set forth, discloses that deceased was traveling on a public road, at a right angle to the

railroad track; there were no obstructions to his view; he could have seen the train continuously from the time he left McLoud's store; the bell was ringing and the whistle was being sounded. Accepting the most favorable evidence to plaintiff, we may assume that the truck was traveling at a speed of 18 miles per hour; the train at a speed of 40 miles per hour. Witness Miller, who qualified as an expert for plaintiff, and who had serviced the truck involved, testified that traveling at 18 miles per hour it could have been stopped in 30 to 35 feet. Therefore, deceased was not actually in a place of imminent peril until he got within 35 feet of the railroad track upon which the train was approaching, since within that distance he was reasonably able to stop the truck and avoid a collision. The engineer had a right to assume that he would do so, nothing appearing to indicate that the driver was not aware of the approaching train, or that he would not stop. Traveling at the rate of 18 miles per hour, it would have taken the truck approximately one and one-third seconds to have traveled 35 feet, the distance within which deceased could have stopped his truck before reaching defendants' track. The train traveling at the rate of 40 miles per hour would travel a distance of approximately seventy-eight feet in one and one-third seconds, which would place it a distance of approximately seventy-eight feet from the crossing when the deceased first reached a place of imminent peril. Again accepting the evidence most favorable to plaintiff, we must assume that it would take at least two seconds for the brakes to take effect after being applied, consequently, there could have been no perceptible slowing down of the train before it reached the crossing upon the application of the brakes, at the time deceased reached a place of imminent peril. The evidence shows that the brakes were applied two hundred feet from the crossing, and yet, there was not a sufficient slowing down of the train to avoid the accident. There is no evidence before us to indicate that the speed of the train could have been so materially reduced as to have averted the collision after the peril arose. It necessarily follows that the evidence is insufficient to support plaintiff's contention.

Able counsel for plaintiff presented us with a very elaborate brief, supported by able and exhaustive argument, but he seems to have disregarded the rules very definitely laid down in recent decisions of the Supreme Court. Under these decisions an engineer is not required to slacken the speed of his train or sound a warning whistle because he sees an automobile approaching the track. If the automobile is traveling at a speed at which it can be stopped before going upon the track, and there is nothing in his conduct to indicate that he is unaware of the approaching train, no duty rests upon the engineer to act, either in reducing the speed of his train or in sounding a warning whistle. [Stark v. Berger, 125 S. W. (2d) 870; Poague v. Kurn et al.,

140 S. W. (2d) 13; Hilton v. Terminal Ry. Co., 137 S. W. (2d) 520; Buehler v. Festus Merc. Co., 119 S. W. (2d) 961.]

It is our conclusion that the evidence before us fails to make a submissible case and that defendants' demurrer thereto should have been sustained. The judgment of the trial court is accordingly reversed and the cause remanded with direction that judgment be entered for defendants. *Tatlow, P. J.,* not sitting and *Smith, J.,* concurs.