# OCTOBER, 1940.

CHARLES THOMASSON, RESPONDENT, V. BERRYMAN HENWOOD, TRUSTEE FOR THE ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, A CORPORATION, APPELLANT.—146 S. W. (2d) 88.

Springfield Court of Appeals. December 14, 1940.

Rehearing Denied December 31, 1940.

*M. Walker Cooper* for appellant.

1214

*C. A. Powell* for respondent.

1216

FULBRIGHT, J.—This is an action by plaintiff to recover damages alleged to have resulted to his automobile truck while being driven by his agent in a collision with one of defendant's freight trains. The cause was tried to a jury resulting in a verdict and judgment for plaintiff, from which judgment defendant has duly appealed to this court.

The petition is in conventional form and among other things alleges in substance that defendant and its employees operating said railroad engine, carelessly and negligently drove and operated said engine with great force and violence against plaintiff's truck and carelessly and negligently failed to sound or ring any bell or whistle at a distance of eighty rods before it reached said crossing, or so sound any bell or whistle from such place until it crossed said crossing. The petition further alleges that plaintiff's agent, servant and employee was driving plaintiff's truck at a slow rate of speed, unaware of the approach of the locomotive engine and train coming behind

him and going in the same direction on said railroad track, and in turning said truck to approach said crossing he was compelled to turn to the right and could not see the train approaching from behind; that defendant's employees in charge of and operating said locomotive saw, or, by the exercise of ordinary care could have discovered the plaintiff's servant, agent and employee in plaintiff's truck in such position of peril in time to have warned him of the approach of the train by sounding the bell or whistle and that had said bell or whistle been so sounded by defendant's agent operating said locomotive, after they saw, or by the exercise of ordinary care could have discovered plaintiff's agent and employee approaching the said track and in said position of peril, he could have stopped the truck and avoided the truck being hit by the defendant's locomotive engine; that defendant's failure to warn was the direct and approximate cause of the injury and damages to plaintiff's truck.

The answer was a general denial and a plea of contributory negligence.

The collision in which the truck is alleged to have been damaged occurred at a public road crossing a few miles north of Dexter, Missouri, and about one quarter miles north or northeast of the "B" gravel plant of the G. G. Hill Gravel Company. This gravel plant is located on defendant's right of way, on the west side of the tracks and south or southwest of the railroad crossing. The gravel pits from which the gravel is taken for the plant are located north of the crossing and the public road runs north and south, the north end being used in going from the crossing up to the gravel pits. There is a private graded, gravel road from the plant to the crossing which intersects with the north and south public road at the crossing and is used in connection with the north end of the public road in hauling from the pits down to the plant. It is west of the tracks and for some distance south of the intersection at the crossing is on defendant's right of way and along near the ends of the ties in the west track or up against the grade of defendant's roadbed.

Defendant's right of way at this point is one hundred feet wide with a double track located so that the center of the right of way is about halfway between the two tracks. The distance between the two tracks, from center to center, is fourteen feet and the distance between the rails of each track is four feet, eight and one-half inches and the distance from the west rail of the west track across the road over to the right of way fence is about forty feet at a point immediately south of the crossing. There are two series of planks used for crossing the tracks, with a narrow space between the two series. Cars can cross only where the planks are located. The railroad tracks at the point of the crossing are somewhat higher than the gravel road parallel thereto and vehicles have to go up a slight incline in passing over the crossing.

At this point the railroad runs almost, if not, due northeast and the public road runs north and south, crossing the railroad at an acute angle, so that one coming from the plant on the private road parallel with the railroad tracks and turning south at the crossing must turn at an angle of approximately forty-five degrees.

The plaintiff is an employee of the gravel company, and was using his truck at the time it was damaged for hauling gravel, he having employed Delmar Ballard to drive and operate same. Ballard had been working for about a year and a half in this capacity and was thoroughly familiar with defendant's railroad at this point, the operation of defendant's trains and the condition of this crossing.

An August 25, 1938, he drove plaintiff's truck, loaded with gravel, from the plant up the private road to the crossing expecting to turn south at the crossing, cross over the railroad tracks and go on to Sikeston where he was to deliver the gravel. At the same time appellant's freight train was traveling north on the west track and the truck and the lead engine met at this crossing. No one was injured in the collision but the truck was damaged.

Plaintiff's evidence tended to prove that the train was traveling at the rate of thirty-five or forty miles per hour and that it gave no warning by bell or whistle, and that the truck was traveling from five to ten miles per hour along the road parallel to the track and that after making the turn to the right at the crossing it slowed down to a slower speed and that at the time the truck reached the crossing it was going only two or three miles per hour. It also tended to prove that after the train passed the tipple of the gravel plant there were no obstructions to prevent the trainmen from seeing the truck nor to prevent the driver of the truck from seeing the oncoming train.

At the close of plaintiff's case the defendant offered instructions in the nature of demurrers to the testimony, generally and also specifically upon the charge of statutory negligence and upon the charge of negligence under the humanitarian doctrine. The plaintiff then elected to dismiss as to the charge of statutory negligence and to stand upon the charge of negligence under the humanitarian doctrine, whereupon the court overruled defendant's demurrers.

Defendant's evidence tended to prove that the bell was ringing upon the lead engine and that the engineer was giving the crossing whistle, the last long blast of which ended at or near the crossing, at which time the engineer applied the emergency brakes when advised by the fireman that he believed they were going to hit a truck. Defendant's evidence also tended to show that the truck was traveling at a faster rate of speed, but that the speed was reduced at the turn and was continued to be reduced up to the crossing.

At the close of the whole case defendant again offered instructions in the nature of demurrers to the evidence, one of which was general,

the other directed specifically to the negligence charge under the humanitarian doctrine. These demurrers were by the court overruled.

Defendant urges six assignments of error, the first of which is: "The court erred in refusing the instructions offered by the defendant in the nature of demurrers to the evidence."

In passing upon this assignment it is the duty of the court to accept as true all evidence favorable to plaintiff and to give him the benefit of all reasonable inferences that may be drawn therefrom and to disregard all unfavorable evidence. [Tea & Coffee Co. v. Baltimore Bank (Mo.), 139 S. W. (2d) 507; Cento v. Security Building Co. (Mo.), 99 S. W. (2d) 1; Willhauck v. Ry. Co., 332 Mo. 1165, 61 S. W. (2d) 336.]

Since this case was submitted by plaintiff solely under the humanitarian doctrine the remaining allegations of primary negligence will be treated as having been waived. The sole question, therefore, in considering the demurrers to the evidence is whether a case for the jury was made under the humanitarian doctrine. The law in this State seems to be well settled that under the humanitarian rule, if a given case is so plain that average fair-minded men cannot reasonably differ there is no case to be submitted; but if there is ground for fair and reasonable difference of opinion about it, the question is for the jury. [Lynch v. Baldwin (Mo.), 117 S. W. (2d) 273; Perkins v. Terminal R. Assn., 340 Mo. 868, 102 S. W. (2d) 915.]

It has been well stated that "The constitutive facts of a cause of action under the humanitarian rule, stated in their simplest terms, without any of the refinements, limitations or exceptions which might arise on a particular state of facts, are contained in this formula: '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.' [Banks v. Morris & Co., 302 Mo. 254, 273, 257 S. W. 482, 484; McCoy v. Home Oil & Gas Co. (Mo. App.), 60 S. W. (2d) 715.]"

"Thus in this State a person may heedlessly and deliberately approach and go across a railroad track with bowed or averted head, looking neither to the right nor the left and oblivious to his surroundings, when, if he would but look, he would see a coming train and could avoid injury; yet, if the operator of the train sees, or by proper care would see, such person going into or continuing in the danger zone, but oblivious of the impending danger, though negligent in being so, he must use all proper care and means to avoid injuring him. In other words, he must not, if he can avoid it, run down or injure a careless man, though his very carelessness is an

integral part of his peril, and he could, if he would, avert such peril. . . . The Missouri rule . . . requires a person operating a dangerous instrumentality to use diligence in avoiding injury to a person whom he sees or could see in or going into peril.'' [Bollinger v. St. Louis-San Francisco R. Co., 334 Mo. 720, 67 S. W. (2d) 985, 990.]

But in the Restatement of the Law of Torts, sec. 480, quoted with approval in the case of Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 1167, 88 S. W. (2d) 368, 371, it is said: ''It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and, therefore, is in peril. The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. *Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing.* (Italics ours.) However, it is not necessary that the circumstances be such as to convince the defendant that the plaintiff is inattentive and, therefore, in danger. It is enough that the circumstances are such as to indicate a reasonable chance that this is the case.''

''Peril,'' or ''imminent peril,'' as that term implies when used in connection with the humanitarian doctrine, means certain peril and not a bare possibility of danger. A place of ''imminent peril'' means a place where there is certain danger imminently impending and admits of no time for deliberation on the part of the person in peril between its appearance and the impending calamity. [Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S. W. (2d) 562, 569; Wallace v. St. Joseph Ry. L. H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011; Clark v. Atchison T. & S. F. Ry. Co., 319 Mo. 865, 6 S. W. (2d) 954, 960; Camp v. Kurn (Mo. App.), 142 S. W. (2d) 772.]

Keeping in mind the foregoing rules we shall determine whether there is any substantial evidence to submit the case to the jury under the humanitarian doctrine.

Plaintiff asserts that a case was made because of failure of the engineer to warn. The evidence on the part of plaintiff discloses that Delmar Ballard, the driver of the truck, was traveling on the gravel road (the truck loaded with gravel) leading from the plant along parallel with the railroad tracks up to the crossing where the colli-

sion occurred. Ballard testified: "As I approached the crossing that day I left the plant driving in second gear about five to ten minutes per hour and did not drive any faster before I reached the crossing. I drove right up the road and you have to make a big circle and I made this circle. I was sitting on the left hand side of the truck, turning to the right and I couldn't see back there when I made that turn. I had to watch that track and hit it and you can't watch that and watch every place else and you can't see very far down there until you got right upon the tracks. . . . I got clear up on the crossing, clear upon the rails, both of them; I pulled up there in low going about two or three miles an hour. I didn't know that a train was going northeast along that track until I got clear upon the track when I heard it coming; I just heard the noise of the train; I didn't hear no whistle and I didn't hear any bell ring. The train was going in the same direction I had been traveling before I got to the crossing; . . . While going up the incline toward the crossing and driving two or three miles an hour I could have stopped the truck in one-half foot or a foot. All you would have to do is to throw in the clutch; you wouldn't have to put on the brake for it would have rolled back."

On cross-examination he testified: "I didn't stop before I went up on the crossing; I drove up there about two miles an hour. . . . I changed my speed from the five or ten miles an hour to the two or three miles an hour just before I made the turn toward the crossing. . . . As I started to turn to the right to go on this crossing I had to travel fifteen, twenty, thirty or forty feet before I reached the crossing; I had to cross the road. . . . I didn't hear any bell ring or whistle sound after the accident occurred. When I pulled up on the track and heard the train coming I looked in that direction and the train was forty or fifty feet from me. I immediately stopped and started to back. . . . As I started to turn and approach this crossing I couldn't see a train coming; I couldn't see around my truck. I was on the left hand side and making a left hand turn."

Again, on cross-examination he stated: "I didn't start making the turn back from the crossing; I was right up at the crossing when I started making the turn. . . ."

C. M. Doty, the fireman, testifying on the part of the defendant, stated: "I first saw the truck when we were 150 or 175 feet from the crossing. He must have been perhaps 20 or 25 feet from where he made the turn to the right. It was just before he turned to the right. . . . When I saw the truck suddenly turn to the right it was about 20 or 25 feet from the turn to the crossing; that is, upon the crossing and I guess the engine was about 100 feet from the crossing then, and about 50 or 60 feet from the crossing when he got on the crossing. Prior to the time he made this sudden turn to the right I had not seen anything to indicate that he didn't know the

train was coming, nor had I seen anything to indicate that he expected to cross at that crossing. Q. Now was the speed of the truck slowed up at all before he got to the crossing? A. It seemed that he was trying to stop before getting on the crossing. Q. Was there a slowing up of the speed to indicate that he was trying to stop? A. Yes sir. . . . Q. It seemed that as he made the turn he began slowing up? A. Yes sir. . . . Q. Now, how close was he to the crossing before it occurred to you that he was not going to stop and before you spoke to the engineer? A. It must have been ten or twelve feet.''

On cross-examination he testified: ''When I saw this man driving up the road I didn't see that he was going to turn; when he was turning I realized he was turning to the right. I was sitting on the fireman's seat and was looking when he first started to turn. When he turned he had about thirty feet to go before he got to the crossing; that is my opinion of it. I was never off on the ground there. The train was going about 35 miles an hour. . . . While he was going 30 feet we went something like 50 or 60 feet. . . . When he got on the crossing I judge we were 30 or 40 feet away, maybe a little better. While he had gone about 30 feet we had gone from about 90 or 100 feet to about 30 or 40 feet. We didn't slow down. It was impossible for us to slow down—I saw him start to back off the track. I didn't know there was a little incline up to the crossing. As soon as I saw him start to turn—it's kind of confusing—as soon as I got my mind set to tell him I said to the engineer: 'It looks like we are going to hit a truck,' and I reached for the bell at the same time. The engineer was blowing the whistle at that time. He blew it continuously until we crossed the crossing. The bell was ringing all that time— it is automatic—I did not turn it off.''

There was sharp conflict in the evidence as to the ringing of the bell and the blowing of the whistle. The uncontradicted evidence was that the freight train was about 4800 feet long and pulled by two large engines.

Accepting the most favorable evidence to plaintiff we must assume that the truck was traveling at a speed of three miles per hour or four and two-fifths feet per second; the train at a speed of thirty-five miles per hour or fifty-one and one-third feet per second. Witness Ballard, the driver of the truck, testified he could have stopped it ''in one-half foot or a foot.'' Applying the rule heretofore stated, Ballard, and the truck were not actually in a place of imminent peril until he got within one-half foot or one foot of a line that would have been traveled by the over-hang of the engine, which, according to the evidence, extends ''beyond the ends of the ties, perhaps a couple of inches or three inches.'' Assuming, as we must in passing upon the demurrer, that no alarm or warning was given, we must determine whether there was any evidence to establish the fact that if

proper warning had been given the collision could have been avoided. Since the truck was traveling at about four and two-fifths feet per second and could have been stopped within one foot, it is obvious that it did not enter a position of peril, that is, the danger zone, until it reached the point where it could not be stopped before entering the pathway of the train. The collision therefore, must have occurred within less than a second after the truck reached the danger zone. Consequently the jury is left to a mere guess as to whether, if a warning had been given, the collision would have been averted. There was nothing in the conduct of the driver of the truck, considering the slow rate of speed with which the truck was traveling or any fact or circumstance disclosed by the record to indicate to the engine men that plaintiff was oblivious to his danger and that he intended to drive the truck upon the track in front of the approaching train. The truck was slowing down and did slow down as it approached the track from a speed of five to ten miles an hour to two or three miles an hour, which would indicate to the engine men that the driver was slowing the truck to a stop before reaching the track to permit the train to pass without danger of a collision. Therefore, the engine men had a right to assume that the driver would stop his truck before entering the danger zone, which under the facts, was a very few feet or inches from the track. [Elkin v. Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600.]

An engineer is not required to slacken the speed of his train or sound a warning whistle merely because he sees an automobile approaching the track. So long as the automobile is traveling at a speed at which it can be stopped before going upon the track, and there is nothing in the conduct of the driver to indicate that he is unaware of the approaching train, no duty rests upon the engineer to act either in reducing the speed of his train or sounding a warning whistle. [Camp v. Kurn, *supra*; Poague v. Kurn et al. (Mo.), 140 S. W. (2d) 13; Hilton v. Terminal R. Assn. (Mo.), 137 S. W. (2d) 520; Stark v. Berger, 344 Mo. 170, 125 S. W. (2d) 870; Buehler v. Festus Merc. Co., 343 Mo. 139, 119 S. W. (2d) 961.]

Obviously, the train was less than fifty-one and one-third feet from the point of collision at the time plaintiff's truck reached the danger zone. It would take less than a second to cover that distance. There is no evidence that if a proper warning had been given by the engine men at the time the truck reached the danger zone the collision could have been avoided. But the court will take judicial notice of the fact that some time must elapse from the moment the engineer realizes the danger and the time the whistle can be blown or the bell rung; that it takes some time for sound to travel, an appreciable time for the truck driver's mind and muscular system to act, for the clutch to be released, and the brakes applied. [Stark v. Berger, *supra*.]

From the foregoing observations it is our conclusion that the evidence fails to make a submissible case. The judgment of the trial court is reversed and the cause remanded with directions that the demurrer be sustained and judgment entered for defendant. *Tatlow, P. J.,* and *Smith, J.,* concur.