**STANDARD OIL CO. v. CROWL.**

No. 14529.

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1952.

Rehearing Denied Aug. 29, 1952.

Woodrough, Circuit Judge, dissented.

W. H. Hoffstot, Jr., Kansas City, Mo. (Henry W. Buck and Morrison, Hecker, Buck, Cozad & Rogers, Kansas City, Mo., on the brief), for appellant.

Walter A. Raymond, Kansas City, Mo. (Homer A. Cope, Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The appellee, Edna T. Crowl, brought this action in a Missouri State court against appellant, the Standard Oil Company, to recover for the death of her husband, Leon W. Crowl, alleging that Crowl died on March 25, 1949, as the result of injuries received on November 26, 1948, in a collision between an automobile which Crowl was driving and a truck negligently operated by one of appellant's employees. Because of diversity of citizenship and the amount involved, the action was removed to the United States District Court for the Western District of Missouri, where judgment was entered for the plaintiff on a jury verdict. The Standard Oil Company appeals.

Appellant's truck driver, Estes, was the only eye witness to the collision. His testimony was offered on behalf of appellee. From the testimony of Estes and that of other witnesses who appeared on the scene shortly after the collision, the following facts were established without dispute.

On November 26, 1948, Estes was driving the Standard Oil truck south on National Avenue in Springfield, Missouri. National Avenue is a concrete street, 30 feet wide. Estes was driving from his home to the Standard Oil Company plant located on the east side of National Avenue. When he reached the point opposite the Oil Company plant, it was necessary for Estes to make a left turn across the northbound traffic lane of National to reach the plant driveway. Because of northbound traffic on National, Estes brought his truck to a stop in the southbound lane to wait an opportunity to drive into the plant. He had waited while several northbound cars passed when he discovered the Crowl car, also northbound, at a distance of 75 or 80 feet to the south. When he first discovered the Crowl car he saw that it was a foot or two over the center line of the avenue. It was moving at a speed of 20 to 25 miles an hour, or, as the parties stipulated, at the rate of 29.2 or 36.5 feet per second.

Estes continued to watch the Crowl car. He saw that it continued over the center line of National, and when it reached a point 50 or 60 feet from him, he discovered that the driver, Crowl, was either oblivious of his situation or was looking toward a lumber company on the left or west side of the avenue. It appeared to Estes that Crowl was driving along as if he was the only motorist on the avenue. Crowl's car continued to veer toward the west side of National until it collided with the truck.

The left side of the Crowl car struck the left side of the truck. From the time Estes saw the Crowl car until the collision Crowl never diminished his speed. All the witnesses agreed that at the time of the collision the Standard Oil truck was stationary within its proper lane, and that the Crowl car was partly over the center line of the avenue. Estes said that when he discovered that Crowl was paying no attention to where he was going, it was too late for him to do anything to avoid the collision, and that within the time at his disposal he could not have moved the truck. He did not sound the horn on the truck.

All the witnesses agreed that Crowl was in a dazed condition immediately following the accident and was unable to give any explanation of his conduct in the operation of his car. He did not know what had happened. He was removed to a hospital in Springfield where he was under the care of Doctor Vail until he was transferred to a hospital in Kansas City where he remained three days. He died on March 25, 1949, of a stroke caused by a cerebral hemorrhage.

There was evidence that for five or ten years before his death Crowl had suffered from high blood pressure and arteriosclerosis. Three doctors testified concerning Crowl's condition after the accident. Dr. Vail, who had Crowl under observation at the hospital at Springfield for about a week, was of the opinion that Crowl had suffered a stroke before the collision occurred. Dr. Duncan, who examined Crowl at the hospital in Springfield, was of the opinion that Crowl had suffered a concussion and a brain injury in the collision. The doctor who treated Crowl at the hospital in Kansas City did not testify. Dr. Steegman, a specialist in the field of medical neurology, who never saw Crowl but who testified after reading the records of the hospitals at Springfield and Kansas City and the testimony of Doctors Duncan and Vail, was of the opinion that Crowl suffered a brain concussion in the collision, and that the injuries sustained by Crowl on November 26, 1948, contributed to cause his death the following March 25.

The questions submitted to the jury were whether the injuries received by Crowl in the collision caused or contributed to cause his death and, if that question was answered in the affirmative, whether the driver of appellant's truck was guilty of negligence under the Missouri humanitarian rule in failing to sound the horn on the truck, causing the collision and Crowl's injuries.

On this appeal appellant contends that there was no substantial evidence to take the

582

question of the truck driver's negligence to the jury, and that the court should have granted its motion for a directed verdict made at the close of all the evidence.

█ Nothing in the Missouri humanitarian rule relieves a plaintiff of the burden of proof, nor opens to the jury the door of speculation and conjecture. The burden was on the appellee to show that Crowl's injury and death were the direct or proximate result of the negligence of Estes in failing to sound the horn on the truck. Vietmeier v. Voss, Mo.Sup.1952, 246 S.W.2d 785, 787; Yeaman v. Storms, en banc, 1948, 358 Mo. 774, 217 S.W.2d 495, 499. Appellee carried the burden of proving by substantial evidence not only that just prior to the accident Crowl was in a position of imminent peril, that Estes discovered or could have discovered the imminent peril to Crowl by the exercise of the highest degree of care imposed upon him by Missouri law as an operator of a motor vehicle on a public highway, but also that when Crowl's perilous position arose or occurred, Estes, within the time and with the means at his disposal, could have avoided the collision and subsequent injuries to Crowl by sounding the horn on his truck. Or, to reduce the issue to its simplest terms, the burden was on the appellee to prove in the situation presented by the undisputed evidence not only that Estes was guilty of negligence in failing to sound the horn on the truck, but also that this negligence caused or contributed to cause the subsequent collision and Crowl's injury. Smith v. Siedhoff, Mo. Sup., 209 S.W.2d 233, 237.

█ In every action under the Missouri humanitarian rule, the basic fact is the imminent peril of the plaintiff. Harrow v. Kansas City Public Service Co, 361 Mo. 42, 233 S.W.2d 644, 648. Under the humanitarian doctrine no duty to act is imposed upon the defendant until plaintiff's situation of imminent peril arises. Moss v. Nehman, Mo.App., 247 S.W.2d 305, 308; Yeaman v. Storms, supra, 217 S.W.2d at page 498; Vietmeier v. Voss, supra, 246 S.W.2d at page 788. And obliviousness of his peril on the part of the plaintiff is a necessary element of a Missouri humanitarian case based on the theory of failure to

warn. idem. "Imminent peril" is certain and immediate peril in the circumstances of the particular case, not contingent peril. Edwards v. Terminal R. Ass'n of St. Louis, 341 Mo. 235, 108 S.W.2d 140, 141; Nagle v. Alberter, Mo.App., 53 S.W.2d 289, 293.

It would be absurd to say that Crowl was in a position of imminent peril from appellant's standing truck when the vehicles were separated by a distance of 75 or 80 feet. At that moment Estes had a right to assume that Crowl was in possession of his faculties. The humanitarian rule did not require of Estes the exercise of the power of second sight. He knew as a matter of common knowledge that Crowl, moving at only 25 or 20 miles an hour, could turn his car into its proper traffic lane. He was entitled to assume that Crowl would do so. The evidence conclusively shows that at the moment in question the route to safety in the proper traffic lane was open to Crowl.

██ Only when Estes discovered that Crowl was oblivious of his situation did the humanitarian doctrine impose upon Estes the duty to act. The evidence is undisputed that at that moment the only thing Estes could do was to sound a warning. Missouri courts take judicial notice that it takes an appreciable time for a person confronted with an emergency to react to the situation and to act to avoid the danger in it. The expression used in the Missouri cases is "reaction time," and in the absence of proof to the contrary the reaction time of a normal person is presumed to be $\frac{3}{4}$ of one second. Vietmeier v. Voss, supra, 246 S.W. 2d at page 788, and cases cited.

We think the opinion of the Supreme Court of Missouri in the Vietmeier case clearly points to the only solution of the problem presented here. The court said, 246 S.W.2d at page 789:

"A humanitarian case upon the theory of failure to warn is different from the usual humanitarian case upon the theory of failure to stop. The theory of failure to stop is predicated solely upon the basis that if the defendant himself had caused the instrumentality to be stopped that the injury would have been thereby avoided. But

when plaintiff's theory and submission is predicated upon defendant's failure to warn there is presupposed (and time must be allowed for) a timely co-operative action by plaintiff in whch to heed the warning and escape injury. This principle is recognized by the adjudicated cases. Harrow v. Kansas City Public Service Co., 361 Mo. 42, 233 S.W.2d 644.

"This court has often written in recognition of the wisdom of that rule. To make a submissible jury case under the theory of failure to warn under the humanitarian doctrine the evidence must disclose that a reasonably sufficient time was afforded, after the duty to warn arose during which time it was reasonably possible for the horn on the car to have been sounded, for plaintiff . to have heard, understood and heeded the horn and for the plaintiff then to have stopped short of running into the automobile. Smith v. Siedhoff, Mo. Sup., 209 S.W.2d 233, 237, Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S. W.2d 764, 769, Rose v. Thompson, 346 Mo. 395, 141 S.W.2d 824, Thomasson v. Henwood, 235 Mo.App. 1211, 146 S.W. 2d 88, Bach v. Diekroeger, Mo.App., 184 S.W.2d 755."

■ Under controlling Missouri law we conclude that the judgment in this case must be reversed because of failure of appellee who carried the burden of proof to show the necessary causal connection between the failure of Estes to sound a warning and the injury and death of Crowl. There is no evidence to support a jury finding that Estes could or should have discovered the imminent peril of Crowl before he saw that Crowl was oblivious of his situation. The appellant's truck and Crowl's car were then at most only 60 feet apart. The Crowl car was approaching the truck at approximately 30 feet a second. Applying the Missouri reaction time theory, the cars were only 37½ feet apart before Estes could have sounded his horn. Thereafter, Crowl must have "heard, understood and heeded" the warning, that is to say he must have returned from the state of complete oblivion to one of full appreciation of his situation. If we indulge the presumption that a man driving his car down the middle of the street in a populous city, utterly oblivious to his surroundings, could have reacted to a warning from appellant's truck within ¾ of a second, Crowl could not have had more than 15 feet, and probably less, when he began to act for his own safety. There is no evidence in the record to show at what distance the Crowl car could have been stopped. Under the evidence the jury could only speculate as to what effect timely warning would have had upon Crowl. The jury could only conjecture as to what Crowl might or could have done to avoid a collision. That Crowl might have decreased his speed to reduce the force of the impact between the cars, or that he might have swerved to one side, or even that he might have stopped, remained under the evidence a matter of pure guess. We conclude that under the Missouri cases no submissible case was made by the appellee.

Reversed and remanded to the District Court with directions to dismiss the complaint.

WOODROUGH, Circuit Judge (dissenting).

The more I have thought of the simple facts of this case, the more the wonder grows that the defendant's truck driver continued moveless at the wheel of the standing truck during the whole time that the plaintiff's decedent was bearing down on the wrong side of the road directly towards and finally into collision with it. It is not one of the common collision cases in Missouri where the plaintiff relied on the state's rule permitting a finding of negligence on what a motorist in the exercise of care ought to have seen even if he says he did not see. Here the trucker himself testified that he *saw* the decedent running out of his proper lane and on the wrong side of the road when the truck and the sedan were 75 to 80 feet apart. The sedan was moving at the moderate speed of 20 to 25 miles, and if the trucker had been over near the curb line on his side of the road, or even if his truck had been in motion and tractable under his hand, he might have momentarily disregarded the movement of the sedan

towards him when it was only a few feet over the center line of the road and 75 to 80 feet away. But the truck being immobile like a sitting duck, close to the center line of the busy road, of course it was an instrumentality of danger to any one coming from the south on the wrong side and the trucker's testimony is unequivocal that he watched the decedent's car the whole distance. He said that decedent had his head turned away from his driving and was looking into a lumber yard off to his left. Neither the trucker's testimony nor anything in the record gives a hint or suggestion of any excuse or justification of the trucker's failure to sound his horn.

It seems to me his failure to blast it was negligence attributable to defendant and I cannot agree to the holding, as a matter of law, that the blasting of it within the time he should in the exercise of care have blasted it, would have done no good. The moderate speed of decedent's car rendered it easily managable and I think that if the decedent was in a normal state of sound mind and body, the blasting of a horn directly in front of him would, in ordinary course, draw his attention back to his driving and cause him to swerve the necessary few feet back to the complete safety of his own lane that was wide open to him, as shown by the evidence.

I find no Missouri decision which seems to me to support a holding by the court in this case that the defendant's negligent failure to warn was not a proximate cause of the collision. Computation of reaction time approved with sound reason in Missouri in failure to warn cases does not establish that this collision would have occurred if the horn had been timely sounded. From two to two and a half seconds travel time intervened from the commencement of the transaction when the vehicles were 75 to 80 feet apart to the collision. Allowing three-quarters of a second reaction time to the trucker to sound his horn and three-quarters more for the plaintiff's decedent to come out of it and swerve back into his lane, there was still from half to a whole second to spare. It was for the jury. I think the trial court's instruction [1] was without prejudice to the defendant and I would affirm.

---

[1.] "* * * So this case is simmered down finally to the sole question of whether or not the sounding of a horn would have averted the accident, the collision. It is the contention of the plaintiff that the deceased was in a position of peril, of imminent peril, and that he was oblivious to that peril and that the defendant in the exercise of that degree of care which the law placed upon him should have seen him and should have done something in this case to have sounded the horn and that it would have avoided the collision. It is the duty of every person operating a motor vehicle upon the highways of this State to exercise the highest degree of care in the operation of that automobile. The highest degree of care is that degree of care which would be expected of a very careful or prudent person under like or similar circumstances, and any failure to exercise that degree of care would be negligence under the law.

"Now, it is the contention, on the other hand, of the defendant that the operator of its car was in no respect careless and negligent. Now, if you find and believe from the evidence that the operator of the defendant's car was not guilty of any negligence, then that ends this case and your verdict should be for the defendant, of course, if he is not guilty of negligence because it must be based upon negligence. The defendant contends that under the circumstances in this case it could not in the exercise of that degree of care which the law imposes upon it have avoided the collision after the plaintiff was in a position of imminent peril by the blowing of a horn. It contends that there was no opportunity even to blow a horn. You ladies and gentlemen of the jury will recall the evidence. The lawyers have discussed it with you. It is undisputed that the defendant's witness, Mr. Estes, first saw the car 75 to 80 feet from the place where he was then standing. The evidence is, as I recall, that at that time his automobile had come to a stop preparatory to turning to the left into the entrance of the Standard Oil Company's place of business. He then saw the car some 75 to 80 feet away, that it was running probably at the rate of 20 to 25 miles an hour. Of course at that rate you have been told how rapidly, in what distance the car would travel at that rate of speed.

"His testimony further is that he first observed the driver of the car, not the

car itself, that he first saw the car 75 to 80 feet away, that it was then veering to the left and across to the left side of the highway; that he saw the driver of the car at fifty-five or sixty, somewhere between fifty and sixty feet away and that he apparently was looking in toward the lumber yard, and I believe the evidence is that he never changed that view but continued to look toward the lumber yard. Now then if I am in error about that, you members of the jury will correct me, and remember what the testimony was.

"Now then, if you find and believe from a preponderance of the evidence that the operator of this car, the deceased, was in a position of imminent peril and oblivious to that peril of colliding with the car and that in the exercise of the highest degree of care the operator of the defendant's car could by the blowing of the horn have warned him and thus averted the collision, it would be your duty to find a verdict for the plaintiff. You must determine when he became in a position of imminent peril, when the operator of the defendant's car had a right to believe under the factual situation as it existed there, when he was in a position of imminent peril, that is, when it became apparent that he was not going to turn his automobile, that he was oblivious to the peril and inevitably if the course were maintained must collide with the car. Now, after that became obvious to Mr. Estes, could he then in the exercise of the highest degree of care within the time that was allowed to him, considering the distances, etc., and the rate of speed, have blown his horn and averted the accident, then it was his duty to do so and a failure to do so would be negligence for which the defendant would be liable."