LENA KRAUSE v. NORMAN B. PITCAIRN and FRANK C. NICODEMUS, JR., Receivers of WABASH RAILROAD COMPANY, Appellants.—No. 36578. —167 S. W. (2d) 74.

Court en Banc, November 12, 1942.

*N. S. Brown* and *Homer Hall* for appellants.

*N. Murry Edwards* and *Douglas H. Jones* for respondent.

344

[REDACTED]

BOHLING, C.—Appellants, as receivers of the Wabash Railway Company, appeal from a $10,000 judgment for respondent. Respondent's husband, Paul Krause, was killed instantly when appellants' west bound train struck his automobile at a public highway grade intersection. Respondent's case was submitted on charges, in the alternative, that appellants negligently failed to warn of the approach or to slacken the speed of the train involved under the humanitarian doctrine. Primary negligence also had been pleaded. Appellants present issues covering the submissibility of respondent's case, the giving and refusing of instructions and the admission of certain evidence. The case is pending on rehearing and reaches the writer upon reassignment.

Taking the substantive facts most favorable to respondent, we adduce the following:

The accident occurred September 19, 1937, a clear, dry, sunshiny day, about 10:30 A. M., at Schaeffer's crossing about four miles west of Wentzville, St. Charles county, Missouri. The railroad track extends east and west and, for practical purposes, the highway, a gravel all-weather road, extends north and south. The railroad track was straight and practically level for more than a mile east of the crossing. An elevation of the ground east of the crossing and immediately south of the railroad right-of-way interfered with the

view of west-bound trainmen of the highway south of the crossing and of north-bound highway travelers of trains east of the crossing. The highway, from a point approximately one hundred feet south of the intersection, slopes upward, rising from six to ten feet in that distance. Mr. Krause's 1932 model Ford "pick-up" truck was ten to eleven feet long and, to the top of the cab, seven feet in height. He was proceeding north along the highway and his eyes were about four-and-a-half feet above the ground. The height of the bottom of the engineer's (on the north) and the fireman's (on the south) seats in the cab of the locomotive from the track was given as between nine and ten feet, the respective lines of vision being some higher. The distance from the front of the locomotive to their respective positions was forty feet. The boiler of the locomotive interfered with the vision to the south of the engineer on the seat. There was testimony that the engineer's angle of vision would not permit him to see the center of the track nearer than two hundred feet ahead or the opposite (south) rail of the track (the width between rails being four feet eight inches) nearer than two hundred sixty to two hundred eighty feet ahead. The locomotive did not interfere with the view of the fireman to the south while on his seat. There was testimony from which a jury could find that a line of unobstructed vision nine feet above the track and five hundred feet east of the crossing would include an object six feet in height forty feet south of the south rail and in the center of the highway and, from one of appellants' witnesses, that the engineer on the north side of the locomotive, as well as the fireman on the south side of the locomotive, when the locomotive was eight hundred feet east of the crossing, could see an object five and a half feet in height twenty five feet south of the south rail and in the center of the highway. From the points given, the approach of a west bound locomotive to the crossing would result in extending the vision to the south along the highway for the fireman and contracting it for the engineer.

Wesley Sherman had followed Krause for a quarter of a mile or more on the morning in question. He testified that Krause approached the incline, one hundred feet south of the crossing, at about ten or fifteen miles per hour; that the incline caused Krause to slacken speed to as slow as five miles an hour at a point, estimated by the witness, "thirty to forty feet from the track"; that Krause apparently did not see the train, changed gears and increased the speed of his automobile as he continued north, moving "anywhere from five to eight miles per hour," "I couldn't be positive about that," at the time he was struck by the train. Witness was estimating Krause's speed, but from his testimony Krause did not slacken his speed from the time he started to increase it on the incline up to the instant of impact. Mr. Sherman heard the approach of the train and saw the smoke therefrom when it was a quarter or half mile from the crossing. He never

saw the train until he was within one hundred feet of the track. He stopped his truck. He heard a "little blast or whistle" when the train was possibly one hundred feet away; or, at another place in his testimony, "it was just before it hit the man." He heard no bell. The train "was running, I would say, about fifty or sixty miles an hour, anyway"; and started to "slowing down" about one hundred feet west of the crossing.

. Other witnesses testified they heard neither bell nor whistle.

When the two front wheels of Krause's truck were "in the middle space between the rails", the front or the left-front part of the pilot struck the automobile on its east, or right, side, from the photographs offered in evidence (which show the bumper of the automobile intact) and the testimony, someplace apparently in the vicinity of the front wheel, the damage to the truck showing on the front five or six feet of the right side. Krause's truck, found about one hundred fifty feet west of the crossing, was in second gear.

Appellants established on cross-examining respondent, that Krause's truck was in good repair and the brakes were "all right." Mr. Sexauer, who had driven the truck sometime previously, was of opinion that in the circumstances it would take ten to twelve feet for it to stop. Mr. Sherman thought it could be stopped in two or three feet "if he had good brakes."

L. J. Bouque was the engineer and James Simcoe the fireman of the train. They put its speed at seventy miles an hour. Neither saw the approach of Krause's truck. The truck never came within the line of vision of the engineer. The fireman, having started to fire the locomotive sometime prior to Krause reaching a position of imminent peril, had been busy firing for several seconds and was "just getting up to get on the seat box" when he felt the impact. When he got to the cab window and looked back, he saw the wrecked truck. There was a crossing three-fourths of a mile east of Schaeffer's crossing but no crossing to the west for a distance of some two miles or more at Foristell. They testified as much traffic approaches highway-railroad, grade intersections from the fireman's as from the engineer's side of the locomotive.

Are appellants to be exonerated under our humanitarian doctrine by reason of the fact the engineer could not see and the fireman, although he could have timely seen had he looked, was engaged in firing the locomotive and did not discover the peril of Krause in time to avoid the collision? We think not. This, aside from any issue involving the credibility of appellants' witnesses Bougue and Simcoe.

We have said it is the duty of trainmen to maintain a lookout for persons approaching or on public highway grade intersections with railroads. Womack v. Missouri Pac. Rd. Co. (Div. 1, 1935), 337 Mo. 1160, 1166, 88 S. W. (2d) 368, 371[2]; Hencke v. St. Louis & H. Rd. Co. (Div. I, 1934), 335 Mo. 393, 397[1], 72 S. W. (2d) 798,

799[3]; Hilton v. Terminal Rd. Assn. (Div. I, 1940), 345 Mo. 987, 992[3], 137 S. W. (2d) 520, 521[3]. And, with respect to an engineer's inability to see and the fireman being engaged with other duties: "If the engineer from his position could not see persons on or dangerously near the track when the train was approaching the station where the presence of people crossing the track should have been anticipated, then it was the duty of the fireman to observe the conditions on his side of. the engine." State ex rel. v. Trimble (Div. II, 1924), 260 S. W. 1000, 1002[2, 4]. See also, on duty of fireman: Thompson v. Quincy, O. & K. C. Rd. Co. (Mo. Div. II, 1929), 18 S. W. (2d) 401, 405[11]; Hoelzel v. Chicago, R. I. & P. Ry. Co. (Div. I, 1935), 337 Mo. 61, 72[6], 85 S. W. (2d) 126, 131[11-13]. "The extension of the doctrine [last clear chance] to perils not actually discovered is fully justified when the situation is such that the defendant owes the duty of looking out for danger, as in the case of persons crossing a railroad at a highway crossing at grade." Dent v. Bellows Falls & S. R. St. Ry. Co., 95 Vt. 523, 530, 116 Atl. 83, 86. Given a duty to maintain a lookout, trainmen are held to look, to see, and to act with due care, where to look with ordinary care is to timely see; and the running of trains blind is not sanctioned under the last clear chance or our humanitarian doctrine. Womack v. Missouri Pac. Rd. Co. (Div. I, 1935), 337 Mo. 1160, 1166, 88 S. W. (2d) 368, 370[1]; Schroeder v. Wells (Div. I, 1925), 310 Mo. 642, 654 (III), 276 S. W. 60, 64(III); Ellis v. Metropolitan St. Ry. Co. (Div. I, 1911), 234 Mo. 657, 671(I), 138 S. W. 23, 28(3), and cases supra.

State ex rel. Fleming v. Bland (Div. I, 1929), 322 Mo. 565, 572, 15 S. W. (2d) 798, 800, was up on certiorari for a conflict of rulings. The holding of the court of appeals under review was to the effect that if a motorman (or engineer) operates a street car (or locomotive) at such a negligent rate of speed that under the humanitarian doctrine he cannot avoid injury to another crossing over the track by slackening speed or stopping on account of the prior negligent rate of speed, he is not to be exonerated by establishing his inability to avoid the injury by the utmost effort on his part, but is held accountable on the basis of an operation of the street car (or locomotive) at a nonnegligent rate of speed. Under the issues presented the court was not ruling on antecedent primary negligence of the nature involved in the instant case when it said that defendant's prior negligence is not to be taken into consideration in determining negligence under the humanitarian doctrine, and it explicitly preserved previous rulings to the effect that a defendant is held to a timely discovery of imminent peril in cases where the due performance of a duty to maintain a lookout would have timely revealed the peril. Vide the summation of prior approved holdings of this court: "Many cases decided by this court impliedly hold that a situation of imminent

peril is the basic fact of the humanitarian doctrine; that no duty whatever arises under that doctrine, unless and until a situation of peril comes into existence; and that when such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care in certain respects—*to make timely discovery of the peril, if it was his duty to be on the lookout,* and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others." (Italics ours.)

The opinion quotes observations bearing on the issue there presented from Sullivan v. Missouri Pac. Ry. Co. (Banc, 1893), 117 Mo. 214, 221, 224(III), 23 S. W. 149, 150, 151(3); Haley v. Missouri Pac. Ry. Co. (Banc, 1906), 197 Mo. 15, 25, 93 S. W. 1120, 1123, 114 Am. St. Rep. 743; McGee v. Wabash Rd. Co. (Div. I, 1908), 214 Mo. 530, 541(III), 114 S. W. 33, 35(3); Keele v. Atchison, T. & S. F. Ry. Co. (Banc, 1914), 258 Mo. 62, 77(d), 79(3), 167 S. W. 433, 438[4, 5, 7], and cites with approval Banks v. Morris & Co. (Banc, 1924), 302 Mo. 254, 266(I), 257 S. W. 482, 484(I). The quotations from the Sullivan, Haley and McGee cases are to the effect that under the humanitarian doctrine a defendant is not liable if at the instant peril arises the speed of defendant's instrumentality renders it impossible in the exercise of due care to avoid the injury, although such speed be a negligent and unlawful rate of speed. The holding in the McGee case was that plaintiff's case was not removed from the field of speculation on defendant's ability to avoid the injury after the humanitarian doctrine seized upon the situation. What is there said with reference to five and one-half seconds and pulse beats is subject to the criticism of observations found in Chawkley v. Wabash Ry. Co. (Banc, 1927), 317 Mo. 782, 797, 297 S. W. 20, 23[2] (see Bury v. St. Louis-S. F. Ry. Co., 223 Mo. App. 483, 487, 17 S. W. (2d) 549, 551), and the dictum therein with respect to the fireman is not in harmony with later observations by the same author in the Keele case (ruled on the assumption of negligence ▆▆▆ in failing to maintain a lookout on the fireman's side of the locomotive—l. c. 76(b) and 437(b), respectively) and quoted with approval in State ex rel. Fleming v. Bland, supra, viz.: " 'So that the law in this jurisdiction [Missouri] also is that when the negligence of the injured party has put him in peril so distant from an on-coming car or locomotive that those operating it can by warning (or by stopping when possible and necessary) avoid injury to such person, after such operatives discover the peril *(or, where a duty to look arises, might have discovered the peril)* then liability for injury springs.' " And: " 'The duty to use care to avoid injury on the hypothesis discussed in paragraph 2 [the humanitarian rule], *arises only on discovery of peril, or on negligence in discovering it when there is a duty to keep an outlook and make discovery of the peril.'* " (Italics ours.)

The author of State ex rel. Fleming v. Bland, supra, formulated the constitutive facts of a humanitarian case in Banks v. Morris & Co., supra, as follows: " ' (1) Plaintiff was in a position of peril; (2) defendant had notice thereof (*if it was the duty of defendant to have been on the lookout, constructive notice suffices*); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.' Evidence tending to prove these facts makes a prima-facie case for plaintiff." (Italics ours.) The quotation immediately follows the approved citation of Murphy v. Wabash Rd. Co. (Banc, 1910), 228 Mo. 56, 128 S. W. 481; Morgan v. Wabash Rd. Co. (Banc, 1900), 159 Mo. 262, 60 S. W. 195; Hanlon v. Missouri Pac. Ry. Co. (Div. II, 1891), 104 Mo. 381, 388, 16 S. W. 233. What is said in these cited cases with respect to maintaining a lookout under the humanitarian rule may be read with interest, especially the Morgan case. In that case the locomotive was running backwards, pushing the tender in front and pulling the caboose. The tender was wider than the locomotive and was so loaded with coal as to prevent the engineer and fireman seeing the track ahead. None of the trainmen saw deceased, who was struck by the train. (l. c. 269, 273(I) and 196, 197(1) respectively.) The court said (l. c. 282 and 200, respectively) in upholding a case made under the humanitarian doctrine: "Under the circumstances of this case, to station someone where he could see what the train was running into, would not be extra caution, but would be the suggestion of the most ordinary prudence. The plaintiff had a right to go to the jury on the hypothesis that the servants of defendant were negligent in failing to use the means at hand to avert the calamity *after, by the exercise of ordinary care, they could have discovered the peril.*" (Italics ours.)

Eppstein v. Missouri Pac. Ry. Co. (Banc, 1906), 197 Mo. 720, 733(d), 94 S. W. 967, 971(d), states: "But if . . . the person so exposing himself to danger (for example, danger from a going locomotive) is at a place where those controlling the dangerous instrumentality have no reason to expect a clear track, but have reason to expect the presence of people, then *it makes no difference whether such person is seen or not, if to look is to see, and if thereafter by the use of ordinary care the danger may be averted.*" (Italics ours.)

See also Womack v. Missouri Pac. Rd. Co., 337 Mo. 1160, 1166, 88 S. W. (2d) 368, 370[1]; Schroeder v. Wells (Div. I, 1925), 310 Mo. 642, 654(III), 276 S. W. 60, 64(III), and (cases discussing instructions) Vowels v. Missouri Pac. Ry. Co. (Banc, 1928), 320 Mo. 34, 39, 8 S. W. (2d) 7, 8; Hoelzel v. Chicago, R. I. & P. Ry. Co. (Div. I, 1935), 337 Mo. 61, 71[5], 85 S. W. (2d) 126, 130[8], among others. Mis-

souri cases like Werner v. Citizens Ry. Co. (Banc, 1884), 81 Mo. 368, 374, present factual situations involving a last clear chance.

Cases falling within the last clear chance doctrine have been classified under four categories with respect to the peril being discovered or discoverable by the defendant and the injured person's ability or inability to escape the threatened danger; viz.: 1st. Danger actually discovered by defendant; injured person physically unable to escape. 2nd. Danger actually discovered by defendant; injured person physically able to escape. 3rd. Danger not actually discovered by defendant but ought to have been; injured person physically unable to escape. 4th. Danger not actually discovered by defendant but ought to have been; injured person physically able to escape. See Annotations, 92 A. L. R. 47, 119 A. L. R. 1041, 20 R. C. L., p. 138 et seq.; 45 C. J., p. 984 et seq.; Restatement, Torts, Secs. 479 et seq. In different jurisdictions defendants are liable for discoverable as well as actually discovered peril under the last clear chance rule. Our humanitarian doctrine is reasoned upon precepts of humanity— that tender regard every man must have for the life and limb of other men in times of peace (Murphy v. Wabash Rd. Co. (Banc, 1910), 228 Mo. 56, 80, 128 S. W. 481, 485; Dutcher v. Wabash Rd. Co. (Div. I, 1912), 241 Mo. 137, 158(I), 145 S. W. 63, 68[1], and is not now sought to be justified on theories involving proximate cause, comparative negligence, willfulness, recklessness or wantonness. It is not to be distinguished, on the issue under discussion, from holdings in jurisdictions imposing liability for a discoverable peril when a duty to maintain a lookout would have timely revealed the peril under the last clear chance doctrine in cases where the injured person is endeavoring to but is unable to extricate himself from the position of peril.

The words are: ". . . to make timely discovery of the peril, if it was his duty to be on the lookout" (State ex rel. Fleming v. Bland) and ". . . if it was the duty of defendant to have been on the lookout, constructive notice suffices" (Banks v. Morris & Co.) and the application of our humanitarian doctrine is not conditioned upon if defendant was looking or if defendant was in a position to see. Certorari proceedings for conflict of rulings which quash records of courts of appeals are restricted to previously announced rules of law and do not promulgate new principles. Had Division One of this Court considered it was overruling previous holdings of the Court en Banc or Division Two, State ex rel. Fleming v. Bland would have been transferred to Banc for approval. The quoted words were advisedly used to preserve our theretofore existing discoverable peril rule under our humanitarian doctrine in cases wherein a defendant owes a duty to maintain a lookout, conforming, in this respect, to last clear chance holdings of other jurisdictions.

Respondent's humanitarian case rests, for its most favorable con-

sideration, upon the testimony of Jeremiah Kaveney, respondent's only expert witness. He had had many years of service as a railroad passenger fireman and engineer, having retired approximately four years prior to the trial. He made observations at Schaeffer's crossing. He was asked specifically within what distance an engine with tender and six coaches traveling fifty miles an hour over the track in question could be stopped with safety, etc., under the humanitarian rule. Respondent had offered no evidence of the consist of the train involved and appellants objected on the ground that a proper foundation (stated in detail by appellants) had not been developed sufficiently for the opinion of an expert witness. In view of appellants' evidence the situation need not arise in the event of a retrial; and we do not develop and rule the issue under the peculiar facts of the instant case (consult Burge v. Wabash Rd. Co. (Banc), 244 Mo. 76, 96(III), 148 S. W. 925, 930(3); Quinley v. Springfield Traction Co., 180 Mo. App. 287, 306, 165 S. W. 346, 352[14]), as appellants also contend no submissible case was made on the issue to slacken speed under the humanitarian doctrine. If so, error in the admission of the testimony would not change the ultimate result of this review.

Kaveney, with respect to the proper slackening of speed in an emergency on the occasion in question, testified to the following results if the engineer "started to stop" at the speeds and distances indicated.

If the train was running fifty miles an hour, its speed could be reduced to between fifteen to twelve miles an hour in three-hundred feet and practically to a stop in four-hundred feet.

If the train was running sixty miles an hour, its speed could be reduced to between fifteen to eighteen miles an hour in three-hundred feet, and to between five to ten miles an hour in four-hundred feet.

If the train was running seventy miles an hour, its speed could be reduced to between thirty to thirty-five miles an hour in three-hundred feet; to between fifteen to twenty miles an hour in four-hundred feet, and to between five to six miles an hour in five-hundred feet.

A proper solution of the issue requires a consideration, among other things, of the corresponding positions of the truck and the train as they approached Schaeffer's crossing at the instant the humanitarian doctrine seized upon the situation and of the distance necessary for the truck to travel to clear the path of the train. Respondent did not undertake to establish the time necessary for Krause to back off of appellants' track. Respondent's most favorable and only evidence —Sherman's testimony—established that the truck was slowing down from an original speed of ten or fifteen to five miles an hour as it proceeded along the southern portion of the one-hundred foot upgrade, and that its speed first commenced to increase above five miles per hour thirty to forty feet south of the track and increased

352

to "anywhere from five to eight miles per hour" at the instant of impact. With Krause possessed of a present ability to stop at eight miles an hour in ten to twelve feet (most favorable to respondent on this issue) or two to three feet,* the humanitarian doctrine certainly did not seize upon the situation nor were appellants charged with any duty to slacken speed thereunder while the speed of the truck was decelerating. Elkin v. St. Louis Pub. Serv. Co., 335 Mo. 951, 956[3 et seq.], 74 S. W. (2d) 600, 603[4 et seq.]; State ex rel. v. Hostetter, 340 Mo. 211, 220, 101 S. W. (2d) 50, 54; Karr v. Chicago, R. I. & P. Ry. Co., 341 Mo. 536, 547, 108 S. W. (2d) 44, 50[9-11]. Consult Christner v. Chicago, R. I. & P. Ry. Co., 228 Mo. App. 220, 228, 64 S. W. (2d) 752, 756-7; Keele v. Atchison, T. & S. F. Ry. Co. (Banc), 258 Mo. 62, 79(3), 167 S. W. 433, 438(7, 8); Clark v. Atchison, T. & S. F. Ry. Co., 319 Mo. 865, 879, 6 S. W. (2d) 954, 960[17]; McGowan v. Wells, 324 Mo. 652, 663, 24 S. W. (2d) 633, 638[4]; Womack v. Missouri Pac. Rd. Co., 337 Mo. 1160, 1167, 88 S. W. (2d) 368, 371 (quoting Restatement, Law of Torts, Sec. 480).

Having submitted separate charges of negligence in the disjunctive, respondent was put to her proof of each of said charges as a sui generis foundation for recovery. State ex rel. v. Hostetter (Banc), 344 Mo. 155, 125 S. W. (2d) 835. Consult Guthrie v. St. Charles (Banc), 347 Mo. 1175, 152 S. W. (2d) 91, 98[12]. The case is close. The record is not fully satisfactory. The distance of the truck from the crossing when its speed was accelerated might have been thirty feet or it might have been forty feet. Its speed might have increased to slightly above five miles an hour or it might have increased to eight miles an hour. Likewise, the speed of the train might have been fifty miles an hour or sixty miles an hour. The same may be said of Kaveney's estimates of speed after the train "started to stop." These variable factors in the instant record are from the testimony of single witnesses, not different witnesses. However, in our discussion we shall give respondent greater consideration on the factual issues involving appellants' duty to slacken speed than she is entitled to receive under the cold law. Humanitarian cases, from the very principles involved, often necessitate niceties in mathematical calculations, for the doctrine does not seize upon the facts until a position of imminent peril arises. Obliviousness merely serves to extend the imminent peril zone. The gravest difficulty with respondent's case on appellant's duty to slacken speed is: Where was appellants' train when the duty to slacken speed under the humanitarian doctrine seized upon the facts? This is of vital importance. Testimony from a single witness that (for instance, quoting respondent's witness) the train "was running, I would say, fifty or sixty

*For cases in which judicial notice has been taken of maximum distances for stopping motor vehicles, see among others, Zickefoose v. Thompson, 347 Mo. 579, 148 S. W. (2d) 784, 790; Dowler v. Kurn (Mo. App.), 119 S. W. (2d) 852, 857[5].

miles an hour, anyway'' does not authorize the taking of the most favorably stated speed for the party upon whom rests the burden of proof. The witness, no doubt, was attempting to give his best judgment of the speed of the train. If testimony from a single witness that ''this or that'' existed as a fact be considered as evidence of ''this'' or ''that'' being a fact, yet the party having the burden of establishing ''this'' to make a case when ''that'' does not make a case fails to remove his cause from the realm of conjecture and establish by substantive probative evidence that ''this'' rather than ''that'' was the fact. ''When the petition, or the evidence introduced in a cause, alleges or proves a state of facts, from which, under the law, liability or non-liability may be equally drawn, then the law says that it is the duty of the court to rule, and so hold, that there is no liability in such a case.'' State ex rel. v. Shelton (Banc), 249 Mo. 660, 696(III), 156 S. W. 955, 965[2], citing authority; Adelsberger v. Sheehy, 332 Mo. 954, 959, 961, 59 S. W. (2d) 644, 645 [1, 6]. Consult Grand Trunk West. Rd. Co. v. Holstein, 67 Fed. (2d) 780, 782[1-4]. How may the jury say that ''this'' and not ''that'' was the fact when the witness does not say which was the fact? The principle involves the substantiveness of the evidence, a question of law for the court; does not involve a conflict in the evidence, a question of fact for the jury; and finds more frequent application in instances where either of two conclusions may just as logically be drawn from the same facts. These observations apply to the several variable factors remaining in respondent's case on the issue to slacken speed at the time of submission.

 In this case the calculations must consider that an appreciable time was required for the fireman's eye to see and his brain to grasp the change in the situation and for his voice to execute a warning and inform the engineer, and for the engineer's ears to hear and his mind and muscular system to react and set the brakes and for the brakes to take hold. '' 'We can take judicial notice of that.' '' Stark v. Berger (Banc), 344 Mo. 170, 174, 125 S. W. (2d) 870, 872[1], which see, quoting McGowan v. Wells, 324 Mo. 652, 666, 24 S. W. (2d) 633, 639[7, 8].

Respondent stresses witness Kaveney's testimony (the italicized portion infra) with respect to the ''reaction'' time involved. ''Q. And then the engineer would hear and understand and comprehend or grasp what the fireman was saying, wouldn't it take some time for him to realize, some time for him to do that, is that true? A. That is correct. Q. And then he would start stopping after he had notice from the fireman he would start these things to stop the train, the engineer would probably reach up and throw the throttle and shut off the steam in order to shut off the power, and he would set his braking power, and he would take his hand and reach down and throw this lever to start the air brakes into motion, into operation, is

that correct? A. That's one way, but if he wanted to make an emergency stop, the fireman would holler at him and say stop right then, you know, and the engineer don't reach and catch ahold, he would employ the brake valve and throw it into emergency stop, he doesn't reach to shut off the throttle, it will shut off the power, and it is all done practically in a few seconds. Q. In two seconds from the time the fireman would give the notice until the engineer would have the brakes set to make his stop, is that what you mean? A. That's what I mean. Q. Then, of course, there is some interval of time that is required before the air brakes, air runs through the train, and the shoes of the brakes shove up against the wheels, that motion takes some time, doesn't it? A. Yes, sir, it takes a fraction of a second to go over the entire train, from one end of the train of the line to the other; all them brakes set automatically at the same time. Q. Well, it would be, then, from the time the fireman would give the warning to the engineer and until the brake shoes would be up against the wheels would be two and a fraction seconds, is that correct, in your judgment? A. *Any part of a second, just quick as a bullet* the air goes down, or something like that.'' This is followed by a denial by the witness that he ever said anything ''about two seconds.'' Kaveney's testimony does not give consideration to the time factor involved in the fireman's comprehending and reacting to the changed situation arising from the truck accelerating its speed. If respondent's construction of witness Kaveney's testimony ''just quick as a bullet'' means that the time for all necessary human functioning here involved and the setting of the brakes was instantaneous and is correct then this court is mistaken in the observations made in Stark v. Berger, supra, and like cases. ''Any part of the second, just quick as a bullet the air goes down, or something like that,'' as pointed out supra, may be evidence of ''something like that'' but is not probative evidence for the party having the burden of proof that the air goes down ''quick as a bullet.'' The witness appears to have been speaking to the time in which ''the air goes down'' and not the psychophysical phenomena of all the reaction time involved, which, notwithstanding his mistaken denial, he had just previously stated would require ''some time'' and later two seconds. Wars demonstrate that humans are not so constituted as to act with the rapidity of bullets. Utterances of witnesses in contravention of the laws of nature or physics, or which are the result of an evident mistake or ignorance are not treated as testimony of probative value merely because uttered; and courts, for instance, are not required to stultify themselves by adjudicating black to be white because some witness through mistake testifies that black is white. Hock v. Missouri Pac. Ry. Co. (Banc), 162 Mo. 569, 581, 63 S. W. 360, 362; Sexton v. Metropolitan St. Ry. Co., 245 Mo. 254, 272, 149 S. W. 21, 25. Especially is this true under the instant record.

■ Respondent bases calculations upon the "average" speed of the train had its speed ■ decelerated in accordance with Kaveney's testimony; that is: Fifty plus twelve is sixty-two, divided by two gives an average speed of thirty-one miles an hour. Applying like calculations to the speed of the truck—five to eight miles an hour—gives an average speed of six-and-one-half miles an hour for the truck from thirty or forty feet south of the track. She says her most favorable testimony is to consider the speed of the train at fifty miles an hour. The slower the speed of the train, the longer the time available to Krause. This accords with the law of physics to the effect that the actual energy, sometimes called kinetic energy, of a moving object such as a train subject to a fixed retarding resistance varies in accord, not with its speed or velocity but, with the square of its speed or velocity; i. e., the difficulty of stopping or slackening the speed of a given object subject to a fixed retarding resistance is more than twice as great when the object is moving at, say, ten miles an hour than when moving at five miles an hour. Respondent's briefs contain calculations, among others, based upon the train being five-hundred and four-hundred feet distant at the moment the humanitarian doctrine seized upon the situation. These assumptions find no support in the record. Taking the above "average" speeds (to which respondent is not entitled under the law) and estimating the speeds and distances involved sufficiently accurate for the instant review, we have: Krause's truck (six-and-one-half miles per hour), if forty feet south of the track, was (moving 9.529 feet per second) 4.2 seconds from the track; if thirty feet south, it was 3.2 seconds from the track; if twenty feet south, it was 2.1 seconds from the track. If 4.2 seconds away, the train (fifty miles per hour) was three-hundred-and-seven feet east; if 3.2 seconds away, the train was two-hundred-thirty-four feet east; and if 2.1 seconds away the train was one-hundred-fifty-four feet east of the crossing. The fireman's mind still had to grasp the change in the situation and he had to react thereto; after which the engineer's mind and muscular system had to react to the fireman's warning and the brakes had to take hold. All the while the train would be moving with unabated speed toward the crossing at the rate of 73.33 feet per second. There is no showing of record upon which to base calculations on slackening speed if a second or a second-and-a-half or two seconds elapsed before the brakes of the train took hold. In addition, the truck had to travel the distance between the rails, four feet eight inches, the overhang of the locomotive, two feet four inches, plus its length of ten or eleven feet—a distance of seventeen or eighteen feet, to clear the path of the train. Even considering the average speed of the train at thirty-one miles an hour after the brakes started to take hold, we cannot say that respondent removed her case upon a duty to slacken speed from the field of conjecture and planted it on a basis of fact. If the truck was but thirty

356

feet south of the track when the humanitarian doctrine seized upon the situation, respondent's case is not aided. (Consult Kick v. Franklin, 342 Mo. 715, 724, 117 S. W. (2d) 284, 288.)

With the speed of the truck changing from a decelerating speed to a continuing accelerating speed, we may not say as a matter of law the jury was not warranted in finding that Krause was oblivious to the approach of the train and that the trainmen, in the exercise of due care, could have discovered such fact and given a timely warning. Zumwalt v. Chicago & A. Rd. Co. (Mo.), 266 S. W. 717, 724[1, 3, 4, 7]; Chawkley v. Wabash Ry. Co., 317 Mo. 782, 797, 798, 297 S. W. 20, 24[2, 3]; Womack v. Missouri Pac. Rd. Co., 337 Mo. 1160, 1167 et seq., 88 S. W. (2d) 368, 371[2-9]. Consult Todd v. St. Louis-S. F. Ry. Co. (Mo.), 37 S. W. (2d) 557, 561[10]; Perkins v. Terminal Rd. Assn., 340 Mo. 868, 877[1, 2], 102 S. W. (2d) 915, 918 [1, 4]; Dutcher v. Wabash Rd. Co., 241 Mo. 137, 164, 145 S. W. 63, 70, among others. These cases establish that respondent made a submissible issue on appellants' duty to warn under the humanitarian doctrine. Court en banc in Dutcher v. Wabash Rd. Co., supra, said: "Assuming that due care may embrace the duty to give alarm signals in some cases, and the further duty, when those alarm signals fail (or apparently will fail) of their purpose, to stop the train, it remains to inquire: When does either duty arise? Attend to what we have ruled on that score: 'It may be safely said as a general rule that the duty of care arises in all cases as soon as the perilous situation of the trespasser is discovered.'" The instant case is distinguishable in that we are not concerned with discovered peril but with discoverable peril. Krause was not a trespasser. "To be free from negligence under the humanitarian doctrine one must act on reasonable appearances ▇ at a time when action would be effective." Perkins v. Terminal Rd. Assn., supra. See also, Homan v. Missouri Pac. Rd. Co., 334 Mo. 61, 78[7], 64 S. W. (2d) 617, 624[13]. It was for the jury, under the presentation, to settle the conflict between witnesses whether Krause's truck could be stopped in two or three feet or a greater distance was required as a factor for consideration in arriving at the danger zone. McGee v. Wabash Rd. Co., 214 Mo. 530, 544, 114 S. W. 33, 36; Rollison v. Wabash Rd. Co., 252 Mo. 525, 539, 160 S. W. 994, 998[7].

A defendant in a death action founded on the humanitarian doctrine is not deprived of the benefit of that portion of Sec. 3652, R. S. 1939, Mo. St. Ann., p. 3353, Sec. 3262, stating a defendant "may show as a defense that such death was caused by the negligence of the deceased." This may be shown in defense in an action based on primary negligence or under the humanitarian rule. However, the statute does not make mere contributory negligence a defense and courts have considered such negligence not a defense to humanitarian issues in actions under the statute. Zickefoose v. Thompson, 347 Mo.

579, 148 S. W. (2d) 784, 787[3], 792[16]; Hinds v. Chicago, B. & Q. Rd. Co. (Mo. App.), 85 S. W. (2d) 165, 168[1].

Practically all of appellants' charges of error in the giving and refusing of instructions and the admission of testimony have been covered in the observations made. Issues about which there may exist a question and not disposed of may be readily avoided by counsel in the event of a retrial and it is unnecessary to extend the opinion for their statement.

Respondent's main instruction was erroneous in authorizing a recovery on appellants' failure to slacken speed under the humanitarian doctrine. The judgment is reversed and the cause remanded.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the Court en Banc. *Leedy, Clark* and *Douglas, JJ.,* concur in result; *Tipton, J.,* concurs in result in separate opinion; *Ellison, C. J.,* concurs in result in separate opinion; *Hays* and *Gantt, JJ.,* absent.

TIPTON, J. (concurring).—█ The respondent's case was submitted solely on the humanitarian doctrine. The appellants' witnesses testified that the locomotive fireman had started to throw coal in the firebox before the deceased Krause reached a position of imminent peril, and was just getting back on his seat in the cab when the casualty occurred. There was no evidence to this effect produced by respondent. Evidently, the jury did not believe appellants' witnesses; this it had a right to do even though such testimony was not contradicted or impeached. Dempsey v. Horton, 337 Mo. 379, 84 S. W. (2d) 621.

Since the collision occurred at a public crossing, it was the duty of the appellants' servants to keep a lookout. In other words, under the humanitarian doctrine, appellants were chargeable with constructive notice. As before stated, there was no evidence produced by respondent that tended to show the fireman was not in his seat; therefore under the jury's finding or on our ruling the case on demurrer, the appellants' evidence on this point should be disregarded. Hence, what is said in the opinions prepared by Bohling, Commissioner, and Ellison, Judge, in reference to antecedent negligence is not necessary to the decision of this case. It has no place in this case, and it is mere dictum.

Could it be said, if I were driving my automobile down a busy street in one of our cities, I could escape liability under the humanitarian doctrine because I testified I was not looking ahead but was looking down at the foot brake and therefore did not see the injured party? I think not. If this point were an issue (which I think unnecessary to decide), and the jury found against me, this court should

not disturb the jury's verdict on account of my testimony. If it did, it would be weighing the evidence, which it has no right to do.

For the reason stated in the opinion prepared by Bohling, Commissioner, in reference to slackening the speed of the train, I think the case should be reversed and remanded.

ELLISON, C. J. (concurring).—My concurrence is limited to the result, because of what is said in the principal opinion concerning State ex rel. Fleming v. Bland, 322 Mo. 565, 572, 15 S. W. (2d) 798, 800. Bearing in mind the respondent's case was submitted solely on the humanitarian doctrine, I think the opinion mingles antecedent negligence with humanitarian negligence. Preceding the discussion of the Fleming case, the statement of facts in the opinion recounts that the locomotive fireman had started to throw coal in the firebox before the deceased Krause reached a position of imminent peril; and was just getting back on his seat in the cab when the casualty occurred. From his position on the "deck" between the locomotive and tender while firing the engine, of course the fireman could not see ahead. Then the opinion mentions that there was another grade crossing ¾ mile east of the one where Krause was struck but none for two miles or more west, in which latter direction the train was going. The implication is that the fireman should have waited until he reached that stretch of track before leaving his seat in the cab and firing the engine. He did that well before Krause got into peril, and thus the foreign element of antecedent negligence is introduced into the case.

That such is the view intended to be expressed, is made clear by what follows. The opinion next cites several cases announcing the well established doctrines: that the engine crew of a train must keep a careful lookout for highway travelers about to cross the track (a breach of which duty generally would be primary negligence); and that the humanitarian doctrine extends to *discoverable* as well as discovered peril. Then follows the statement about the Fleming case (parentheses ours): "Under the issues presented (in that case) the court was not ruling on antecedent primary negligence of the nature involved in the instant case (duty to keep a lookout) when it is said that defendant's prior negligence is not to be taken into consideration in determining negligence under the humanitarian doctrine."

It is true the antecedent negligence in the Fleming case was not failure to keep a lookout before the plaintiff got into peril: it was negligent running of a streetcar at a speed in violation of a city ordinance so that the motorman could not stop after the plaintiff's peril arose. The Kansas City Court of Appeals had held the plaintiff could recover under the humanitarian doctrine because the motorman had negligently put it out of his power to heed the precepts of that doctrine, but the Fleming case quashed the opinion for the reason

that contributory negligence is a defense to primary negligence, but not to humanitarian negligence; and hence, when primary or antecedent negligence is mingled with humanitarian negligence, and yet the defendant is denied the right to rely on the contributory negligence as a defense, he is deprived of a valuable right. In an effort to dispel the confusion in certain prior decisions the Fleming case held as plainly as words can phrase it (it seems to me) that under the humanitarian doctrine the defendant owes no duty *of any kind* to the plaintiff until the latter's peril arises. It says (italics ours):

"Many cases decided by this court impliedly hold that a situation of imminent peril is the basic fact of the humanitarian doctrine; that *no duty whatever* arises under that doctrine, unless and *until* a situation of peril comes into existence; and that *when* such peril arises the doctrine seizes upon the situation as it *then* exists and requires the one operating the dangerous instrumentality to exercise ordinary care in certain respects: *to make timely discovery* of the peril, if it was his duty to be on the lookout, and *thereafter* to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others."

The Fleming case has been followed 21 times to date since it was decided in 1929; and it makes no difference whether the plaintiff's antecedent negligence consisted of a failure to stop, slow up, swerve, warn, keep a lookout, or anything else whatsoever, the rule is the same—necessarily so because of the reason behind it. Among the recent cases holding there is no humanitarian duty to keep a lookout before plaintiff's peril arises, are Buehler v. Festus Mercantile Co., 343 Mo. 139, 159, 119 S. W. (2d) 961, 970, and State ex rel. Snider v. Shain, 345 Mo. 950, 954, 137 S. W. (2d) 527, 529. Both these were banc decisions. In the Buehler case an instruction was condemned which imposed on the defendant a duty to see (or keep a lookout for) the plaintiff *approaching* a position of imminent peril —i. e., *before* he was in peril; in the Snider case the instruction used the expression: "in *or immediately coming into* a position of peril," and that likewise was held bad. A recent Division 1 case is Reiling v. Russell, 348 Mo. 279, 153 S. W. (2d) 6, 8(1). In Division 2 are Chastain v. Winton, 347 Mo. 1211, 152 S. W. (2d) 165, 169 ▉ (5), and Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2d) 120, 127(14). This last case seems squarely in point. This Division reversed and remanded plaintiff's case for error in an instruction declaring the enginemen were bound to keep a reasonably careful lookout for persons on, near or approaching the track *because* it was not limited in application to the time after the peril arose.

Nothing here said is to be understood as denying that if the fireman was bound to be on the lookout when the deceased's peril began, then he was chargeable with *constructive* notice—that is, a *duty* to make timely discovery of the peril, as the Fleming case says. But if, by

being down at the firebox he had put it out of his power to *act* and warn the engineer as quickly as if he had been up in his seat, that delay caused by his antecedent negligence cannot be counted against him. That was the precise holding in the Fleming case, and in Spoeneman v. Uhri, 332 Mo. 821, 830, 60 S. W. (2d) 9, 11, where a motorist by driving too fast had put it out of his power to save the plaintiff after the latter's peril arose. With the time element as close as it is in this case, the above factor might make some difference: but the differentiation and limitation of the Fleming case as an authority is the point to which this concurring opinion is addressed.