**ROBERTS**

v.

**CHICAGO, B. & Q. R. CO.**

No. 21874.

Kansas City Court of Appeals.

Missouri.

Feb. 1, 1954.

H. M. Langworthy, Clyde J. Linde, Robert B. Langworthy, Kansas City, Langworthy, Matz & Linde, Kansas City, of counsel, for appellant.

David J. Dixon, Rogers, Field & Gentry, Kansas City, Joseph H. McDowell, Kansas City, of counsel, for respondent.

SPERRY, Commissioner.

Bill J. Roberts sued the Chicago, Burlington & Quincy Railroad Company, a corporation, for damages to plaintiff's truck when it was struck by one of defendant's trains at a grade crossing in rural Missouri. From a judgment of $1,300, in plaintiff's favor defendant appeals.

The following facts are not in dispute:

The collision occurred on August 18, 1947, at about 6:50 p. m. Plaintiff was operating his Studebaker truck, loaded with 125 cases of eggs, the gross weight being about 18,000 pounds. It was traveling west on paved highway 59. Defendant's steam engine was proceeding backward, pulling three box cars and a coach, traveling in a southeasterly direction. The collision occurred at the intersection of the railroad and the highway. Just before the collision occurred the truck was traveling at a speed of about 45 miles per hour, and the train was proceeding at a speed of about 20 miles per hour. The highway was an east-west road, the paved portion being 18 feet wide, with a 4 foot earth shoulder on either side of the pavement. The highway was level at this point for a distance of several hundred feet on either side of the crossing. The elevation of the railroad bed was the same as that of the highway, and was level for a distance of several hundred feet west of the crossing. The railroad crossed the highway at an angle of slightly less than 20 degrees. There was an ordinary railroad crossing sign located on the north side of the highway, something more than 300 feet east of the crossing. Defendant maintained a standard crossing sign located on the north side of the highway at the crossing; and it also maintained at the crossing an electrically operated "blinker" or "wig-wag" signal, equipped with a bell, which was in operation.

Plaintiff introduced into evidence a plat, marked exhibit 1. It was drawn to scale and, according to the evidence, it fairly represents the railroad and the highway, together with important landmarks in the vicinity. The plat was drawn some 5 years after the collision occurred and it was shown that some physical changes had occurred after the collision and prior to the preparation of the plat. For instance, the highway pavement had been widened from 18 to 22 feet, and the shoulders, on each side, from 4 to 8 feet. The ditches along the highway, on either side, had been deepened. Some trees, located near the Shear

house, hereafter referred to, had been removed.

Defendant contends that other major physical changes had occurred along the highway but its evidence in this connection was controverted by that of plaintiff. No major physical alterations had occurred in connection with the railroad itself.

Plaintiff testified to the effect that he had never before traveled highway 59 at this point, and did not know that there was a railroad crossing located there; that his truck was about one year old and in good mechanical condition; that, when he was one-half mile east of the crossing, he saw an automobile approaching the crossing from the west (witness Strange's car); that the truck was traveling at a speed of 45 miles per hour; that it continued at that speed until it reached a point about 150 feet east of the crossing when plaintiff heard the train whistle and, for the first time, became aware of its approach; that he eased up on the accelerator and slowed down slightly; that he concluded that he could not stop in time to avoid a collision; that there were deep ditches on each side of the road; that the train then was about 75 feet from the crossing; that, when he was about 50 feet from the crossing, he pressed down on the accelerator and swerved to his left, intending to cross ahead of the train, at the furthest point of the crossing from the train; that he increased speed "slightly," about the same that he had previously decreased; that the engine struck the truck in front of the rear wheels, throwing the truck into the ditch west of the tracks; that he was not personally injured.

On cross-examnation he stated that the windows of the truck were down; that he did not see or hear the electric "wig-wag" signal at the crossing prior to the collision but saw it afterward; that he did not hear the whistle until he was within 150 feet of the crossing; that he did not see the train prior to hearing the whistle, nor did he see the "wig-wag" signal; that he failed to see the crossing sign, the electric "wig-wag" or the approaching train, because the sun was shining in his eyes, at the angle from which the train was coming, and the "wig-wag" was slightly off the highway; that he could not stop the truck, loaded, as it was, at the speed at which it was traveling, within less than from 250 to 300 feet; that he could have stopped in time if he had had knowledge of his danger before coming to a point less than 300 feet from a crossing.

Mr. Strange, testifying on behalf of plaintiff, stated that he and his wife were driving east on highway 59, at a point one-fourth mile west of the crossing, when he first saw the train and heard it whistle; that it started whistling at the whistling post (shown on the plat as 443 feet west of the Shear crossing); that he first saw plaintiff's truck approaching from the east, about 800 to 900 feet from the crossing; that the train was traveling at a speed of about 20 miles per hour; that witness drove to a point about 80 feet from the crossing and stopped; that the truck approached at a uniform speed of from 40 to 50 miles per hour until it reached a point from 50 to 60 feet east of the track; that, until that time, the driver gave no sign of having seen the train; that, at that point, the truck increased speed and swerved to the left; that the train hit the truck and knocked it into the ditch. The witness stated that the road had been widened since the accident; that a large pear tree, 40 feet tall, formerly located near the Shear house where it could have interfered with the vision of the engineer, had since been removed.

Mrs. Strange, who was riding with her husband, was a former railroad employee. She stated that as they approached the crossing from the west she saw the truck, some 700 feet east of the crossing; that they parked to watch the train pass; that she heard it whistle at the whistle sign; that the truck was then near the Shear house; that the driver gave no sign of being aware that the train was near, but that the sun shone against the windshield so as to prevent her actually seeing plaintiff; that the truck approached without change of speed until it reached a point two or

three truck lengths from the crossing, when it swerved to the left and was struck.

Mr. Eader, a highway patrolman, stated that he arrived at the scene at 7:25 p. m.; that plaintiff stated "The sun was in my eyes and I did not see the train until too late."

Mr. Frush, an engineer, stated that he prepared the plat, exhibit 1; that his first inspection of the scene was a few days before the trial; that he set up a transit 777 feet north and west of the crossing and could see a man at the center of the highway at a point 865 feet east of the intersection; that the slab of the highway is now 22 feet wide.

Mr. Newman also testified for plaintiff. He stated that he was then, and had been for 4 years past, an officer with the accident department of the Kansas City, Missouri, police department; that he had been present at the scene of, and investigated some 500 traffic accidents and had received special training concerning the braking efficiency of automobiles and trucks, such as the truck involved in this accident, at various speeds and under varying circumstances; that he had been taught, professionally, how to arrive by mathematics at the stopping distance required for a given vehicle under given conditions. The pertinent facts of the collision here involved were hypothesized in a question propounded to him. The witness gave it as his opinion that the truck could not have been stopped within less than 337½ feet, not counting reaction time; that, counting reaction time, it would require 385½ feet.

Plaintiff also produced Mr. Dellenger as a witness. He was a retired locomotive engineer and, in answer to a hypothetical question, stated that, in his opinion, if the train had been traveling at 15 miles per hour, it could have been brought to an emergency stop within from 80 to 90 feet; that, at 20 miles per hour, it could have been stopped within a distance of 100 feet.

Defendant offered the testimony of a number of witnesses. The engineer, Mr. Cooper, stated that the train was proceeding in a southeasterly direction at a speed of from 15 to 18 miles per hour; that he began a series of whistles near the whistling post, at a point about 300 feet west of the crossing (the whistling post is 443 feet west), consisting of two longs, a short and a long; that it took about 11 seconds to complete the series; that he completed the series of whistles about at the crossing; that the automatic signal, one on each side of the crossing, was on; that the automatic bell on the engine was ringing; that, when he was about half way from the whistling post to the crossing, he saw the truck which was, at that time, coming into view from behind some trees near the Shear house; that he could not have seen it sooner because of the trees; that it was traveling at a speed of from 40 to 45 miles per hour; that it continued at that speed until it reached a point about half way between where he first saw it and the crossing, when it slowed down; that he thought it was going to stop but, when it was about 75 feet from the crossing, it increased speed and swerved to the left; that he then, for the first time, realized that plaintiff was not going to stop; that the lead of the train was then 30 feet from the crossing; that he applied the emergency brake when the lead was 15 or 20 feet from the crossing; that he could have, and did stop, within 40 feet after realizing that a collision was imminent; that there was a fence running north from the highway, about 50 feet west of the Shear house; that trees grew along the fence, which prevented his seeing the truck prior to the time he did see it.

Mr. Boggs lived at the Shear house. He stated that he heard the train whistle for the crossing and heard the electric signal bell ringing; that, at about the same time, he saw plaintiff's truck pass, traveling at 45 or 50 miles per hour; that the whistle sounded several loud blasts; that there were two trees east of the house, one on either side of a 12 foot driveway; that there was a Catalpa tree 60 feet high, 50 feet west of the driveway, and a cottonwood tree on a line with the west side of the house, in the front yard; that there

was a north-south fence, which came to the highway line, about 40 feet west of the house, with trees 20 feet high growing along the fence; that there were sunflowers growing along the highway 12 feet high; that the trees were removed after the collision occurred and before the plat was made; that pictures of the scene, made shortly before trial, do not show said trees.

Mrs. Boggs testified to a fact situation quite similar to that described by her husband. She heard the whistle, the signal bell, and the crash.

G. W. Boggs, Jr., corroborated the testimony of his parents.

Mr. Henson was driving eastward along the highway, following witness Strange. He said he saw the train, which was 100–200–300 feet, or more, west of the crossing, and was whistling; that his attention was drawn to the train by the whistle; that it was whistling all of the time; that the "wig-wag" signal at the crossing was working, the red light swinging; that he first saw the truck after he saw the train; that it was then about even with the Shear house; that he observed nothing that indicated that the truck driver was aware of the approach of the train until it swerved near the crossing.

Mr. Noll was riding with Henson. He said he saw the train when it was several hundred feet from the crossing, that it whistled several times; that he saw the truck when it was 75 or 100 feet from the crossing, traveling 35 to 40 miles per hour; that it did not change its speed or course until it swerved, near the crossing; that the train had not cleared the crossing when it stopped, after the collision.

Some other witnesses appeared on behalf of defendant but, since their testimony was chiefly cumulative, we shall not set it out.

Defendant contends that the court erred in overruling its motion for a directed verdict because there was not sufficient evidence to support a recovery on the basis of failure to timely warn, slacken speed, or stop. The issues were submitted in the conjunctive.

On the issue of failure to give timely warning, plaintiff's evidence totally failed. Although he stated that he *heard* no warning bell or whistle until he was within 150 feet of the track, other witnesses produced by him stated that the train whistled repeatedly, from a point 443 feet northwest of the crossing, until virtually the moment of the collision. They also stated that the "wig-wag" signal was in operation; and plaintiff, himself, saw it in operation after the accident occurred. In order to hold that plaintiff made a case on this theory we would have to reject, or disregard, all of his positive evidence on the point, as well as all of defendant's evidence; and we would have to predicate such a finding on plaintiff's negative evidence, that he neither *heard* nor *saw* any signal in time to save himself.

The issue of liability for failure to stop or slacken speed is more difficult of solution. In disposing of that issue it is appropriate to review the origin and development of the humanitarian doctrine and some of the rules governing its application.

The Missouri humanitarian theory of negligence derives from the "last clear chance" doctrine, which is traced from the English case of Davies v. Mann, (1842) 19 Eng.Rul.Cas. 190; 152 Exchequer, Book 8, 547–549; 92 A.L.R., pages 49 and 80. It only operates toward a plaintiff who is actually in imminent peril; and it does not arise or exist until defendant is charged in law with knowledge (actual or constructive) that plaintiff is actually in a position of imminent peril. Constructing and Reviewing Instructions—Trusty, (Missouri Edition) 149. See also 92 A.L.R. 79–80. The doctrine has been clearly defined and followed in Missouri for many years. Hanlon v. Missouri Pacific Ry. Co., 104 Mo. 381, 16 S.W. 233.

The constructive facts of a cause of action under the Missouri humanitarian

rule, classically stated in Banks v. Morris & Co., 302 Mo. 254, 267, 257 S.W. 482, 484, are as follows:

"'(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.'"

It was held, in the above case, that evidence tending to prove the facts stated makes a prima facie case for plaintiff. It follows that if there is a failure of evidence as to any essential element, no submissible case is made. Shepherd v. Chicago, R. I. & P. R. Co., 335 Mo. 606, 72 S.W.2d 985, 988. In the case at bar, obliviousness of danger on the part of plaintiff was necessary in order to make his situation perilous. It was, therefore, "* * * incumbent upon the plaintiff to make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but *to bring home to defendant a knowledge of his peril*" in time for the engineer to act effectively to avert the collision. Banks v. Morris & Company, supra. (Italics ours.)

And that brings us to the kernel of this case: Was there substantial evidence tending to prove that defendant's engineer should have realized that plaintiff was oblivious of the presence of the train as it (and he) approached the crossing, in sufficient time for him thereafter, by the exercise of ordinary care, with the means at hand, etc., to have stopped the train before striking plaintiff's truck?

■ Plaintiff came into a position of imminent peril when the truck reached a point where it could not be stopped before reaching the overhang of the approaching train, due to plaintiff's obliviousness. Plain-

tiff's expert witness, Eadon, gave it as his opinion that this point was 385.5 feet east of the crossing. Plaintiff, owner of the truck and an experienced operator, stated that he could have stopped within 250 to 300 feet and that, had he been aware of the danger before reaching a point 300 feet east of the crossing, he could have stopped in time to have avoided the collision.

■ The engineer's testimony was to the effect that he did not see and could not have seen the truck until it reached a point about 300 feet from the crossing. There was other testimony in the case, concerning the location and height of trees, which tended to support the engineer on this point; but whether or not the engineer could have seen, or did see the truck *before* it came into a position of imminent peril, is not material. The engineer was not required to anticipate that the truck would drive onto the track in front of an approaching train, in plain view, with whistle and bell sounding, and an electric flasher signal operating. He was not required to take any action, under the humanitarian doctrine, until plaintiff came into a position of imminent peril. Krause v. Pitcairn, 350 Mo. 339, 167 S.W.2d 74, 76; Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889, 900.

■ However, if there was anything in the demeanor of the plaintiff that should have indicated to a reasonable man in the engineer's place that there was a reasonable chance that plaintiff was not going to stop, then the engineer should have taken steps to protect plaintiff. Knorp v. Thompson, supra. Plaintiff's testimony was that the speed of the truck, about 45 miles per hour, was unchanged from a point 300 feet from the crossing until it reached a point about 150 feet from the crossing; that, at that point, he heard the whistle and saw the train; that he then "let up" on the accelerator, and "slightly" slackened speed. He contends that since he came into a position of peril 300 feet from the crossing and continued at the same speed a reasonable man should have realized that he was oblivious of danger, and that the engineer

should have acted, when the truck was 300 feet from the crossing; but, if plaintiff saw the train, he was not in a position of peril at that point, for he could have stopped, and he knew that he could stop. Thomas v. Aines Farm Dairy, Mo.App., 257 S.W.2d 228, 232. The engineer could have assumed that plaintiff did see him and would stop unless something in his demeanor or action indicated a contrary intent. The engineer was not negligent in failing to realize that plaintiff was oblivious because of the sun shining in the face of plaintiff, so as to prevent him from seeing the train and signal. Shepherd v. Chicago R. I. & P. R. Co., supra.

■■ When the truck was 300 feet from the crossing, traveling at a speed of 67½ feet per second, the train, traveling at a speed of 30 feet per second, was approximately 135 feet from the crossing, and could have been stopped, at that speed, within 100 feet. (The engineer said his speed was 15 to 18 miles per hour and that, at the speed he was going, he could have stopped, and did stop, within 40 feet.) But there was no duty to act until he reasonably should have known that plaintiff could not, or would not stop. He should not be charged with having the knowledge of an expert regarding the stopping distance of the truck; and, if he had had such knowledge, he still did not know the weight of the truck, or that the egg cases were full and each weighed 60 pounds. He is charged only with realizing what a reasonable man should have realized under the same circumstances. We cannot say that a reasonable man should have realized that the truck was in a position of peril when it was ¾ of a block away, proceeding at a speed of 45 miles per hour, approaching a train in plain sight on a level roadway with all signals being given.

■ About 2¼ seconds later, after the truck had traveled 150 feet without diminution of speed the engineer said the truck slowed a little. Plaintiff says he decreased speed slightly. At that time the train might still have been stopped (within 40 feet) for it was 67½ feet west of the crossing. But a reasonable person, we think, would have thought, in view of all the circumstances shown in this case, that plaintiff intended to stop when he slackened speed. Indeed, that is what he did intend to do but, after traveling at a slightly reduced speed for a distance of about 75 feet (little more than a second in time) plaintiff said that he realized that he could not stop. He then swerved to the left and accelerated his speed, indicating that he would not stop; but, at that time, the train was less than 40 feet from the crossing, and could not have been stopped in time to avoid the collision.

■ In Missouri we have extended the humanitarian theory of negligence to cover cases where there is substantial evidence tending to prove that defendant could have seen plaintiff in a position of peril, even when due to his own negligent inattention to his safety, continued until the instant of impact. It has been said that nothing short of suicide or wilful conduct of the injured person will deprive him of the benefit of the doctrine if defendant realized, or could have realized, plaintiff's peril in time to have acted. 92 A.L.R. 81. That is far enough. The finder of the facts should not be permitted to fix liability in the absence of substantial evidence tending to prove that defendant, as a reasonable person, should have reasonably realized that plaintiff was in a position of imminent peril, especially when peril is due solely to obliviousness through inattention, in time for defendant to have acted effectively to avoid the injury.

The judgment should be reversed.

BOUR, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is reversed.

All concur.